Slip Op. 04-94

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CHIA FAR INDUSTRIAL FACTORY CO., LTD., | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES, | : | Before: Wallach, Judge<br>Consol. Court No.: 02-00243 |
| Defendant, | : | |
| and | : | **PUBLIC VERSION** |
| ALLEGHENY LUDLUM CORP., <u>et al.</u>, | : | |
| Defendant-Intervenors. | : | |

[Plaintiff Chia Far's Motion for Judgment upon the Agency Record is denied; Plaintiffs' Allegheny Ludlum Corp., <u>et al</u>. Rule 56.2 Motion for Judgment upon the Agency Record is denied; and United States Department of Commerce's Final Results and Partial Rescission of Antidumping Administrative Review are affirmed.]

Dated: August 2**,** 2004

<u>DeKieffer & Horgan</u>, (<u>A. David Lafer</u>, <u>J. Kevin Horgan</u>, and <u>John J. Kenkel</u>) for Plaintiff Chia Far Industrial Factory Co., Ltd..

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director; <u>Michael S. Dufault</u>, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and <u>Jonathan J. Engler</u>, Attorney, Office of Chief Counsel, U.S. Department of Commerce, of Counsel, for Defendant United States.

<u>Collier, Shannon & Scott, PLLC</u>, (<u>David A. Hartquist</u>, <u>Jeffrey S. Beckington</u>, and <u>Adam H. Gordon</u>) for Plaintiffs and Defendant-Intervenors Allegheny Ludlum Corp., <u>et al</u>.

<u>White & Case, LLP</u> (<u>William J. Clinton</u> and <u>Adams C. Lee</u>) for Defendant-Intervenors Yieh United Steel Corp.

## OPINION

**WALLACH, Judge:**

### I
### Introduction

In this action, Plaintiff Chia Far industrial Factory Co., Ltd. ("Chia Far") and Plaintiffs

and Defendant-Intervenors Allegheny Ludlum Corp., AK Steel Corp., Butler Armco Independent

Union, J&L Specialty Steel, Inc., United Steel Workers of America, AFL-CIO/CLC, and

Zanesville Armco Independent Organization (collectively "Allegheny") challenge the final

results of an administrative review issued by the United States Department of Commerce

("Commerce") with respect to Stainless Steel Sheet and Strip From Taiwan: Final Results and

Partial Rescission of Antidumping Duty Administrative Review, 67 Fed. Reg. 6,682 (Feb. 13,

2002) ("Final Results"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1999). For

the following reasons, this court finds Commerce's determination is in accordance with the law.

### II
### Background

On July 20, 2000, Commerce published a notice in the Federal Register of opportunity to

request an administrative review of merchandise subject to the antidumping order on stainless

steel sheet and strip coils from Taiwan. Antidumping or Countervailing Duty Order, Finding, or

Suspended Investigation; Opportunity To Request Administrative Review, 65 Fed. Reg. 45,035

(July 20, 2000). Chia Far and Yieh United Steel Co. ("YUSCO"), Taiwanese producers and

exporters of the subject merchandise during the period of review ("POR")[1], June

---

[1] In Initiation of Antidumping and Countervailing Duty Administrative Reviews and
Requests for Revocation in Part, 65 Fed. Reg. 53,980 (Sept. 6, 2000), the Federal Register lists in
a table that the POR for Taiwan: Stainless Steel Sheet and Strip in Coils was January 4, 1999,

through June 30, 2000. In <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u> ("Notice of Initiation"), 65 Fed. Reg. 71,299 (Nov. 30, 2000), the Federal Register lists in a table "Taiwan: Stainless Steel Sheet and Strip in Coils, A-583-831, Chia Far Industrial Factory Co., Ltd." and the POR for this antidumping duty proceeding as June 8, 1999, through June 30, 2000. In FN 2, referencing "Taiwan: Stainless Steel Sheet and Strip in Coils," it further states that "[i]n the initiation notice published on September 6, 2000, (65 FR 53980), the review period for this case was incorrect and [Chia Far] was inadvertently omitted. The period listed above is the correct period of review for this case and, we are adding the above-listed firm to the other firms' initiation for that review."

In the Final Results, 67 Fed. Reg. 6,682 (Feb. 13, 2002), the Federal Register states: "[t]his review covers imports of subject merchandise from [YUSCO], . . . [Chia Far] and Ta Chen Stainless Pipe, ltd. ('Ta Chen'). The [POR] is January 4, 1999 through June 30, 3000." The same notice then states: "[t]he review covers imports of subject merchandise from YUSCO, . . . Chia Far and Ta Chen. The POR is June 8, 1999, through June 30, 2000."

Chia Far states in its Motion for Judgment Upon the Agency Record at 2 that Commerce had defined the POR as between January 4, 1999, to June 30, 2000. The other three parties state in their briefs that the POR is June 8, 1999, through June 30, 2000. The court ordered the parties to file briefs to clarify these apparent discrepancies in the POR. <u>Chia Far Indus. Factory Co. v. United States</u>, Court No. 02-00243 (Order dated June 8, 2004).

In response to the order, Defendant stated that the correct POR was June 8, 1999, through June 30, 2000. Defendant's Brief Regarding Discrepancy in Period of Review ("Defendant's Brief on POR") at 1. Defendant explained that, in the Notice of Initiation, Commerce erroneously identified the POR as January 4, 1999, through June 30, 2000, because it

> had not suspended the liquidation of entries on the date of the preliminary determinations in this case, as amended on January 27, 1999, because it preliminarily determined that the respondents' dumping margins were <u>de minimis</u>. <u>See</u> <u>Notice of Amended Preliminary Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan</u>, 64 Fed. Reg. 4,070, 4,072 (Jan. 27, 1999). Commerce ordered the suspension of liquidation on the date of publication of the final determination, June 8, 1999, when positive margins were found. <u>See</u> <u>Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan</u>, 64 Fed. Reg. 30,592 (Jun. 8 1999).
>
> Because Commerce can review dumping margins only for suspended entries, Commerce amended its <u>Notice of Initiation</u>, noting that the correct period of review was from June 8, 1999 through June 30, 2000. <u>See</u> <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 65 FR 71,299,

3

8, 1999, through June 30, 2000, requested an administrative review for their merchandise entering the United States during the period. See Defendant's Public Version Appendix at 3 ("DPVA"). Allegheny also requested a review of YUSCO, Tung Mung and Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen") and their affiliates,[2] pursuant to 19 U.S.C. § 1677 (33) (2000). DPVA at 4. Accordingly, on September 6, 2000, Commerce initiated an administrative review as to Chia Far, Tung Mung and YUSCO. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 65 Fed. Reg. 53,980 (Sept. 6, 2000).

On September 7, 2000, Commerce issued its initial antidumping questionnaires for its

_____

71,300 (Nov. 30, 2000).

Defendant's Brief on POR at 2. All the other parties to the case concur that the correct POR was June 8, 1999, through June 30, 2000. See Plaintiff's Brief Regarding Discrepancy in Period of Review; Defendant-Intervenors' Brief Regarding Discrepancy in Period of Review, on behalf of Allegheny; Response in Support of Defendant's Brief Regarding Discrepancy in Period of Review, on behalf of YUSCO.

[2] The following persons under 19 U.S.C. § 1677(33) are considered "affiliated" or "affiliated persons":
    (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
    (B) Any officer or director of an organization and such organization.
    (C) Partners.
    (D) Employer and employee.
    (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
    (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
    (G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

administrative review. See DPVA at 8.  On October 12 and November 6, 2000, Chia Far

responded to Commerce's Section A and C questionnaires. Defendant's Response to the Motions

for Judgment Upon the Administrative record filed Chia Far Industrial Factory Co., Ltd. and

Allegheny et. al. ("Defendant's Response") at 5.  YUSCO responded to the questionnaires on

September 28, 2000, and October 30, 2000, and November 6, 2000. Id.  On November 30, 2000,

the administrative review was amended  to include the name of Chia Far. Initiation of

Antidumping and Countervailing Duty Administrative Reviews, 65 Fed. Reg. 71,299 (Nov. 30,

2000).

On April 20, 2001, the domestic industry's representatives met with Commerce to

express concerns that Chia Far's previously reported U.S. sales through Lucky Medsup ("LM")

had been improperly classified as export price[3] transactions. Response by Allegheny Ludlum

Corp., et al., in Opposition to Motion for Judgment on the Agency Record by Chia Far Industrial

Factory Co., Ltd. at 2 ("Allegheny's Response").  In a letter dated May 4, 2001, Commerce

memorialized this meeting and reopened the record for two days under 19 C.F.R. §

351.301(c)(2)(I) to receive factual information pertaining to those transaction. See Letter from

Edward Tang, Office Director, AD/CVD Enforcement, Office 9, to Jeffery [sic] Beckington,

Esq., Collier Shannon Scott (May 4, 2001) ("May 4th letter"); DPVA at 10.  In its May 4th letter,

Commerce also noted that the regulations at 19 C.F.R. § 351.301(c)(1) permit any interested

party ten days to submit factual information to rebut, clarify, or correct factual information

---

[3] "Export price" is defined as the "price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . ." 19 U.S.C. § 1677a(a) (2000).

submitted by any other interested party.

Consistent with the Department's May 4th letter, Allegheny placed on the record factual information concerning Chia Far's affiliation with LM. Included in this submission was certain material for which Allegheny requested double-bracketed treatment under 19 C.F.R. §§ 351.304(a)(2)(ii) and 351.304(b)(2). By letter dated May 17, 2001, Chia Far responded stating as to LM *inter alia*, "Chia Far and this customer do not have, did not have in the POR, and did not have prior to the POR a principal/agent relationship, either in fact (via an agency contract) or in theory." Letter from John J. Kenkel, DeKieffer & Horgan, to the Hon. Don Evans, Secretary, U.S. Department of Commerce (May 17, 2001) ("Chia Far's May 17 Letter to Commerce"); DPVA at 7.

On May 21 and 22, 2001, the Department apprised Allegheny that Allegheny's May 4th letter was being returned and not accepted for the record due to the Department's conclusion that no clear and compelling need for double-bracketed treatment had been shown by Allegheny. Letter from Rick Johnson, Program Manager, Enforcement Group III, Office 9, to Jeff Beckington, Esq., Collier Shannon Scott (May 21, 2001); Letter from Rick Johnson, Program Manager, Enforcement Group III, Office IX, to Jeff Beckington, Esq., Collier Shannon Scott (May 21, 2001); Allegheny's Response at 3. On May 24, 2001 Allegheny filed an amended version of their May 4th letter, having deleted all of the double bracketed information. They explained in their cover letter that the information was removed in light of its sensitivity and Allegheny's fear that irreparable financial injury might occur if the double bracketed information was compromised. Letter from Jeffrey S. Beckington, Collier Shannon Scott, to Secretary of Commerce, U.S. Department of Commerce (May 24, 2001); Allegheny's Response at 3. On May

6

25, 2001, Commerce issued a Supplemental Questionnaire to Chia Far, to which the company responded on June 4, 2001. DPVA at 6.

On June 11, 2001, Allegheny responded to Chia Far's June 4, 2001, supplemental questionnaire response. As with the May 4th letter, Commerce concluded there was no clear and compelling need for the double-bracketed treatment for certain information. Thus, Allegheny submitted the redacted version of the June 11th letter to Commerce on June 18, 2001, following a meeting between Allegheny's' counsel and Commerce officials on June 14, 2001. The June 18 letter contained, among other documents, a "Certificate of Sole Agency," dated January 18, 1994, between Chia Far and LM, which was signed by the presidents of each company, certifying that "Lucky Medsup Inc. is working as a sole agent for Chia Far Industrial Factory Co., Ltd. in the West Coast District of The United States of America". Letter from Jeffrey S. Beckington, Collier Shannon Scott, to Secretary of Commerce, U.S. Department of Commerce (June 18, 2001) at Enclosure 1. Chia Far did not respond in writing to Allegheny's June 18 letter.

Commerce issued its Verification Report as to Chia Far on July 11, 2001, and Chia Far submitted preliminary comments on the Verification Report to Commerce on July 26, 2001. On August 8, 2001, Commerce issued its preliminary determination Stainless Steel Sheet and Strip in Coils from Taiwan: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 66 Fed. Reg. 41,509 (Aug. 8, 2001) ("Preliminary Results"). In that notice, Commerce preliminarily rescinded the administrative review with respect to Ta Chen based upon the party's claim that it made no shipments of the subject merchandise during the period of review. Commerce received comments from the parties in September 2001.

After considering comments by the parties, Commerce issued its final determination on

February 13, 2002.  See Final Results, 67 Fed. Reg. at 6,682.  In the Final Results, Commerce rescinded the review with respect to Ta Chen, found zero antidumping margins with respect to YUSCO and Tung Mung, and found a 21.10% margin with respect to Chia Far. Id.

**III**
**Arguments**

Plaintiff Chia Far claims that the administrative record shows that (1) Chia Far and its customer, LM, were not affiliated; (2) Commerce did not allow Chia Far to meaningfully participate in the administrative review; and (3) Commerce's decision to impute an affiliation was not based on substantial evidence on the record.  Chia Far further argues that the application of adverse facts available was unwarranted because it was truthful in all of its responses to Commerce's requests for information and cooperated to the best of its ability. Lastly, Chia Far claims that the 21.10% adverse facts available rate that Commerce applied to it is punitive and erroneous. Thus, it says, Commerce's decision was arbitrary and capricious, not in accordance with the law, and not supported by substantial evidence on the administrative record.

Defendant, the U.S. Government, argues that Chia Far and its largest U.S. customer, LM, are affiliated.  Defendant asserts that its application of adverse facts available, its decision to apply adverse inference to all of Chia Far's U.S. sales during the period of review, and the 21.10% adverse facts available rate it imposed on Chia Far are supported by substantial evidence and are otherwise in accordance with law.  Defendant argues that it correctly accepted and relied upon information submitted by Allegheny after the initiation of the administrative proceedings. Defendant argues that it properly protected the name of Chia Far's customer, LM. Defendant claims that it correctly refrained from imposing an adverse facts available rate on YUSCO and

8

from collapsing YUSCO, Yieh Mau, and Yeoh Yih to formulate the adverse facts available rate. Lastly, Defendant argues that its decision to rescind its review with respect to Ta Chen is supported by substantial evidence and is otherwise in accordance with law.

Allegheny, the Plaintiff and Defendant-Intervenor, argues conversely that Chia Far had an adequate opportunity to participate in the administrative review and that Commerce correctly found affiliation between Chia Far and its customer/agent, LM. Allegheny posits that LM's name should no longer receive business proprietary treatment, given its relationship with Chia Far. Allegheny argues that Commerce correctly imposed adverse facts available on Chia Far, but that the rate Commerce chose was insufficient to serve as a deterrent. With respect to YUSCO, Allegheny claims that Commerce should have imposed an adverse facts available rate on YUSCO and that it should have collapsed YUSCO, Yieh Mau, and Yeoh Yih to arrive at the correct adverse facts available rate. Finally, Allegheny argues that Commerce should not have rescinded its review of Ta Chen.

YUSCO, the Defendant-Intervenor, argues that Commerce was correct in not imposing on it the adverse facts available rate. YUSCO also claims that Commerce's determination to not employ collapsing methodology when examining its relationship with Yieh Mau and Yeoh Yih is supported by substantial evidence and is otherwise in accordance with law.

## IV
## Standard of Review

The Court of International trade will sustain "any determination, finding or conclusion" made by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B) (1999); <u>Fujitsu Gen. Ltd. v. United</u>

9

States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). The possibility of drawing two inconsistent conclusions from the evidence contained in the record, does not render Commerce's findings unsupported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966). Additionally, the court does not weigh the wisdom of Commerce's legitimate policy choices. Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

**V**
**Discussion**

**A**
**Chia Far**

**1**
**Commerce's Holding that Chia Far and its U.S. Customer are Affiliated Through a Principal/Agent Arrangement Is Supported By Substantial Evidence**

**a**
**Commerce Lawfully Compiled the Administrative Record**

**(1)**
**Commerce Used its Discretion in Accordance with Law in Not Accepting Chia Far's Proffered Evidence**

Plaintiff Chia Far argues that the record provides no evidence of affiliation between itself and its largest U.S. Customer, LM. It contends that Allegheny's June 18, 2001, letter which showed affiliation, did not apply to this POR and that Commerce's determination ignores substantial record evidence because the relationship alleged by Allegheny ended prior to the POR. Furthermore, Chia Far says that it submitted commission ledgers at verification, which

10

Commerce would not look at or accept, which it claims showed an absence of commissions to LM during the POR by contrasting earlier ledgers showing commission payments in early 1994 through mid-1995; Chia Far, however, claims not to have found "[any document memorializing such an agency]." Chia Far's Motion for Judgement [sic] Upon the Agency Record ("Chia Far's 56.2 Motion") at 9.

Chia Far accuses Commerce of preventing Plaintiff from adequately defending itself by not allowing Plaintiff to submit evidence to controvert its conclusion. Id. at 11. While claiming that the verification team's comments dissuaded Chia Far from submitting pre-POR data, Chia Far did tell the team that it would provide a document showing the absence of agency during the POR by producing a document showing the rescission of agency in 1995. But, Chia Far claims that "it could not find the hoped-for document." Id. at 12. Chia Far argues that Commerce and Allegheny have failed to place on the record any information that is contemporaneous with the POR that refutes Verification Exhibition 12. Id. at 12-13 (referring to Verification of Chia Far Industrial Factory Co., Ltd. in the 1st Antidumping Administrative Review for Stainless Steel Sheet and Strip in Coils ("SSSS") from Taiwan, A-583-831, from Laurel LaCivita, Senior Import Compliance Specialist, to The File, through Rick Johnson, Program Manager (July 11, 2001) ('Verification Report")).

Allegheny, on the other hand, argues that the administrative record has been assembled properly. Allegheny claims that Commerce acted correctly in rejecting Chia Far's commission ledger submissions under 19 C.F.R § 351.307(d) because Commerce is only under an obligation to consider submitted information and Commerce "chose not to review the two aforementioned documents because the company's acknowledgment represented significant new information of

11

the type that could not be considered at verification." Allegheny's Response at 17 (quoting the Verification Report at 7). Also, Allegheny asserts, Chia Far had ten days to rebut, clarify, or correct Allegheny's June 18, 2001, letter under 19 C.F.R. § 351.301(c)(1) and failed to do so.

Commerce disagrees with Chia Far's claim that Commerce's refusal to accept information in commission ledgers from 1994 through 1999, submitted during Verification, to rebut the content of Allegheny's June 18 submission is evidence of unfairness and bias. Issues and Decision Memorandum for the Final Results of Antidumping Administrative Review of Stainless Steel Sheet and Strip in Coils ("SSSS") from Taiwan, A-583-831, from Joseph A. Spetrini, Deputy Assistant Secretary, AD/CVD Enforcement Group III, to Faryar Shirzad, Assistant Secretary for Import Administration (February 4, 2002) ("Issues and Decision Memorandum") at 33-34. Commerce considered this submission to be new information of the type that could not be considered at verification.

The administrative record was lawfully compiled by Commerce. The applicable statute, 19 U.S.C. § 1677m(I) (2001), directs Commerce to

> verify all information relied upon in making –
>
>> (1) a final determination in an investigation,
>>
>> (2) a revocation under section 1675(d), and
>>
>> (3) a final determination in a review under section 1675(a) of this title, if–
>>
>>> (A) verification is timely requested by an interested party as defined in section 1677(9)(C), (D), (E), (F), or (G) of this title, and
>>>
>>> (B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is

12

shown.

Under the regulation, 19 C.F.R. § 351.307 (2001)[4], Commerce has to "verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d). Commerce enjoys considerable latitude in its verification procedures. See Hercules, Inc. v. United States, 11 CIT 710, 726 (1987). The statute and regulation require Commerce to verify information but generally leave the scope of verification and the procedures for conducting it to Commerce's discretion. U.S. Steel Group v. United States, 177 F. Supp. 2d. 1325, 1331 (CIT 2001).

In its correspondence with Chia Far, Commerce made clear that "verification is not intended to be an opportunity for submitting new factual information." Letter from Rick Johnson, Program Manager, AD/CVD Enforcement Group III, to Chia Far Industrial Factory, c/o Jay Kenkel, DeKieffer & Horgan (June 7, 2001) at 2 (emphasis in original).[5] This instruction is customary and consistent with Commerce's usual practice, see Final Affirmative Countervailing Duty Determination; Stainless Steel Sheet and Strip in Coils from France, 64 Fed. Reg. 30,774, 30,788 (June 8, 1999), and with case law, see Am. Alloys, Inc. v. United States, 30 F.3d 1469, 1475 (Fed. Cir. 1994); Hercules, 11 CIT at 725-27; Kerr-McGee Chem. Corp. v. United States, 14 CIT 344, 362 (1990). See Acciai Speciali Terni S.p.A. v. United States, 142 F. Supp. 2d 969, 1007 (CIT 2001). Thus, this case is not one in which Commerce was under obligation to accept

---

[4] 19 C.F.R. § 351.307 states, along with a detailed verification timeline, that "[p]rior to making a final determination in an investigation or issuing final results of review, the Secretary may verify relevant factual information."

[5] Commerce's stated, in this same letter, that it could accept new information at verification only when "(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record."

the commission ledgers outside the POR which Chia Far submitted on July 26, 2001. Chia Far had denied consistently the existence of any sole agency contract with LM until after Petitioners June 18, 2001, letter. In fact, as Commerce points out, "despite previous statements on the record to the contrary, the company now acknowledged the existence of [the contract] . . . ." Verification Report at 7. When Chia Far submitted this additional factual evidence to controvert the continued existence of the sole agency contract by providing commission ledgers from 1994 through 1999, Commerce fairly considered the information as "significant new information of the type that could not be considered at verification." Id.

Even if the submission was a rebuttal to Allegheny's June 18, 2001, letter, that response would have been governed by 19 CFR § 351.301(c)(1)(2001):

> If factual information is submitted less than 10 days before, on, or after (normally only with the Department's permission) the applicable deadline for submission of such factual information, an interested party may submit factual information to rebut, clarify, or correct the factual information no later than 10 days after the date such factual information is served on the interested party or, if appropriate, made available under APO to the authorized applicant.

This would have required the response to have been submitted to Commerce by June 28, 2001, which was not the case. As a result, Commerce correctly chose not to review the documents during the verification process. Because its conclusion is based on a reasonable inference drawn from evidence in the record, Commerce acted in accordance with the law.

### (2)
### Commerce Properly Accepted Allegheny's June 18, 2001, Submission as Timely

Plaintiff Chia Far alleges that Commerce did not follow its own rules, under 19 C.F.R. § 351.301(c), which states that new information may be submitted to Commerce to rebut

information filed by another party only if it is submitted within ten days. Here, Plaintiff posits that Commerce should not have accepted Allegheny's June 18, 2001, submission because it was filed out of time, during the verification process. Chia Far argues that Commerce should not have accepted the submission under its rules, which in turn would have ended the inquiry on affiliation. Chia Far's 56.2 Motion at 19. Plaintiff asks that all the new information submitted by Allegheny on or after May 25, 2001, including double-bracketed items which Plaintiff did not have the opportunity to inspect, be stricken from the record.

Allegheny states that under 19 C.F.R. § 351.304(d), Commerce must determine within thirty days after submission the status of information provided and then the submitting person has two business days to take any number of actions should the submission not conform to 19 U.S.C. § 1677f(b) and 19 C.F.R. § 351.304(d)(1). Allegheny states that it filed its June 18, 2001, submission in a timely fashion.

Commerce urges the court to reject Chia Far's argument that Commerce improperly accepted new information from Allegheny, "i.e. the evidence withheld by Chia Far that included a material contractual document." Defendant's Response at 14. Citing 19 C.F.R. § 351.301(c)(1), Commerce argues that it acted lawfully in accepting the information and granting Chia Far the courtesy of the "10 day rule" to rebut Petitioners contentions. Commerce says that Chia Far was not unlawfully prejudiced by the inclusion of Petitioner's submission and that the inclusion in the record was proper. Defendant's Response at 43.

Commerce properly accepted Allegheny's letter, dated June 18, 2001, as a timely submission. As per 19 C.F.R. § 351.301(c)(1)(2001), and, pursuant to 19 C.F.R. § 351.304(d) (2001),

15

(d) Nonconforming submissions.

> (1) In general. The Secretary will return a submission that does not meet the requirements of section 777(b) of the Act and this section with a written explanation. The submitting person may take any of the following actions within two business days after receiving the Secretary's explanation:

> > . . . .

> > (ii) If the Secretary denied a request for business proprietary treatment, agree to have the information in question treated as public information;

> > . . . .

> (2) Timing. The Secretary normally will determine the status of information within 30 days after the date on which the information was submitted. If the business proprietary status of information is in dispute, the Secretary will treat the relevant portion of the submission as business proprietary information until the Secretary decides the matter.

Allegheny submitted its letter in a timely fashion on June 18, 2001. Commerce issued a supplemental questionnaire on May 25, 2001. Chia Far responded to Commerce's questionnaire on June 4, 2001. On June 11, 2001, Allegheny responded to Chia Far's June 4 letter. Within the 30-day time period under 19 C.F.R. § 351.304(d)(2), in meetings Allegheny's counsel had with Commerce on June 14, 2001, Commerce notified Allegheny of its objections to the double-bracketing of certain information and rejected the letter. Allegheny was given two business days under the regulation to remedy the submission – June 18, 2001, was a timely filing.[6] Commerce thus correctly accepted Allegheny's June 18, 2001, submission lawfully in accordance with its regulations. As a result, the relevant data filed by Allegheny on or after May 25, 2001, including

---

[6] Since June 14 was a Thursday, the two business days allowed under 19 C.F.R. § 351.304(d)(1) allowed Allegheny until Monday, June 18, to refile its June 11, 2001, letter with Commerce: Allegheny thus submitted the redacted letter in a timely fashion on June 18, 2001.

16

the Certificate of Sole Agency between Chia Far and LM dated January 1994 remains on the record.

**b**
**Commerce's Determination that Chia Far and Lucky Medsup**
**Were Affiliated Is in Accordance with Law**

Chia Far denies that its relationship with LM was anything other than seller/customer during the POR. Chia Far had stated that it "and this customer [LM] do not have , did not have in the POR, and did not have prior to the POR a principal agent relationship, either in fact (via an agency contract) or in theory. Chia Far's May 17 Letter to Commerce at 2.[7] It was only following Allegheny's June 18, 2001, submission that Chia Far even acknowledged the existence of an agency agreement with LM at any point. Yet, Chia Far summarily dismisses the sole agency contract document proffered by the Petitioners in their June 8, 2001, submission to Commerce. It claims that it had "forgotten" about the document, that a review of its archives did not produce such a document and that this was especially the case since the contract had not been in effect for six years prior to verification. Reply Brief in Support of Motion for Judgment on the Agency Record by Chia Far Industrial Co., Ltd. ("Chia Far's Reply") at 2; see Chia Far's 56.2 Motion at 26. In fact, Plaintiff says that there was no record evidence to prove that the agency was still operative during the POR. Chia Far's Reply at 4-5. Plaintiff Chia Far claims that Commerce ignores the facts on record which show a normal reseller business relationship between Chia Far and LM.

---

[7] Chia Far references this statement in its 56.2 Motion at 25 n. 20: "Chia Far firmly believes the reason why Commerce used AFA against it is because of its May 17 response in which it said it 'never' had an agency relationship with this customer. That statement no doubt caused Commerce (and was certainly used by the petitioners to bolster their arguments), to question everything Chia Far said – even to the point of ignoring verified information!"

17

Chia Far challenges Commerce's reliance on <u>Notice of Final Determination of Sales at</u> <u>Less than Fair Value: Engineered Process Gas Turbo-Compressor Systems, Whether Assembled</u> <u>or Unassembled, and Whether Complete or Incomplete, from Japan</u> ("Gas Turbo Determination"), 62 Fed. Reg. 24394, 24402-03 (May 5, 1997), which set out five factors for determining the existence of a principal/agent relationship. Chia Far argues that in that case there was a much higher degree of control asserted by the producer on the end-customer, bypassing the reseller. Chia Far disputes Commerce's use of five Gas Turbo Determination criteria as well as the two additional criteria[8] seemingly added in the Memorandum for the Final Results. Chia Far argues that its "responses were based on its own data in the POR, not on a subjective interpretation imputing facts to Chia Far." Chia Far's 56.2 Motion at 20. Plaintiff claims that its briefs only responded to the five initial criteria and thus did not have the chance to represent itself adequately before Commerce. <u>Id.</u> at 21.

Allegheny contests Chia Far's assertion that it had no U.S. affiliates, and argues that Chia Far was affiliated with LM. Allegheny in its submissions points to a number of facts as well as the existence of the sole agency agreement that it submitted to Commerce on June 18, 2001, to substantiate its claim.

Pursuant to 19 U.S.C. § 1677(33)(G) (2001), an affiliate or an affiliated person is "[a]ny person who controls any other person and such other person." This statute further provides that

---

[8] The seven criteria are: 1) the foreign producer's role in negotiating price and other terms of sale; 2) the extent of the foreign producer's interaction with the U.S. customer; 3) whether the agent/reseller maintains inventory; 4) whether the agent/reseller takes title to the merchandise and bears the risk of loss; 5) whether the agent/reseller further process or otherwise adds value to the merchandise; 6) the means of marketing a product by the producer to the U.S. customer in the pre-sale period; 7) whether the identity of the producer on sales documentation inferred such an agency relationship during the sales transaction. Chia Far's 56.2 Motion at 20.

18

"a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[9] 19 U.S.C. § 1677(33)(G). The control element is central as per 19 C.F.R. § 351.102(b) (2001),

> "affiliated persons" and "affiliated parties" have the same meaning as in section 771(33) of the Act. In determining whether control over another person exists, within the meaning of section 771(33) of the Act, the Secretary will consider the following factors, among others: corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships. The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

See China Steel Corp. v. United States, 264 F. Supp. 2d 1339, 1350-51 (CIT 2003). When Commerce issued this regulation, which became effective July 1, 1997, it did not explain specifically the standards for finding "control" or "affiliated persons." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,297 (May 19, 1997). Commerce stated that it was "more appropriate" for Commerce to develop its practice regarding affiliation "through the

---

[9] The Statement of Administrative Action uses the same language: "if one person is legally or operationally in a position to exercise restraint or direction over another person." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-465, at 838, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4174-45 ("SAA"). The SAA explains that this definition of control is a shift from the prior definition:

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another even in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchises or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.

Id.

19

adjudication of actual cases" on a case-by-case basis.  Id.; see also Ta Chen Stainless Steel Pipe, Inc. v. United States, 23 CIT 804, 820 (1999).

In practice, in previous investigations, Commerce has stated that a principal/agent relationship may be determined from an agency agreement, but evidence of the parties' conduct may also be used by Commerce to determine whether the relationship exists. See Gas Turbo Determination, 62 Fed. Reg. at 24,403.  Commerce also has said that in the absence of an explicit agreement, but when there exists a principal who has the potential to control pricing and/or the terms of sale through the end-customer, Commerce will find agency and thus affiliation. See Notice of Final Results of Antidumping Duty Administrative Review: Furfuryl Alcohol from the Republic of South Africa, 62 Fed. Reg. 61,084, 61,088 (Nov. 14, 1997) ("Furfuryl Alcohol"). But, as Commerce admitted when it promulgated the regulations, its determination of agency is purely on a case-by-case basis; thus, the court must consider whether the factors which Commerce uses are based on a permissible construction of the antidumping statute and regulation. See China Steel Corp., 264 F. Supp. 2d at 1351.

In this case, Commerce has used a four part test to determine affiliation which is a reasonable interpretation of the statute and regulations.[10]  Commerce states that the agency's

---

[10] There was some confusion in this case as to the exact set of factors Commerce used to arrive at its affiliation decision. In the Issues and Decision Memorandum, Commerce cited seven criteria that it said it "may" use to determine if an agency relationship exists and then says "for example" before citing the list:

> 1) the foreign producer's role in negotiating price and other terms of sale;
> 2) the extent of the foreign producer's interaction with the U.S. customer;
> 3) whether the agent/reseller maintains inventory;
> 4) whether the agent/reseller takes title to the merchandise and bears the risk of loss;
> 5) whether the agent/reseller further processes of otherwise adds value to the

"established practice is to collectively examine the following *four* principal factors" drawn from

19 C.F.R. 351.102 and from a previous investigation, Furfuryl Alcohol, 62 Fed. Reg. at 61,088:

> (1) the extent to which the foreign producer participates in negotiating price and other terms of sale with the end-customer;
> (2) whether the foreign producer participates directly in marketing the subject merchandise to the end-customer, and the end-customer has knowledge at the time of sale of the producer's identity;
> (3) the extent of the foreign producer's interaction with the U.S. customer on product testing and other technical matters;
> (4) the extent to which the foreign producer has direct contact with the end customer.

Defendant's Response at 21-28 (emphasis added).

In this case, applying the four part test, Commerce found adequate factual evidence that Chia Far was affiliated with LM under the terms of the statute and the regulations. Commerce found Chia Far and LM to be affiliated parties because of the "explicit principal/agent agreement" that Allegheny submitted on June 18, 2001, showing a principal/agent relationship starting at one point in time without a specific termination date.[11] Commerce notes that the sole

_____

> merchandise;
> 6) the means of marketing a product by the producer to the U.S. customer in the pre-sale period;
> 7) whether the identity of the producer on sales documentation inferred such an agency relationship during the sales transaction.

Issues and Decision Memorandum at 26 (citing Gas Turbo Determination, 62 Fed. Reg. at 24,402-03). During oral argument held on April 23, 2004, the court asked Commerce to elucidate what criteria or factors it used to come to its conclusion regarding affiliation. Commerce stated that it used a four part test while using the "seven factors as exemplary." Since the seven criteria as well as the four factors are in accordance with 19 C.F.R. § 351.102 and Commerce provided a satisfactory explanation for its procedures during oral argument, the court upholds its determination.

[11] Chia Far admitted during the June 23, 2004, oral argument that there was no explicit document that evidenced the termination of the explicit principal/agency agreement.

agency contract was not controverted by Chia Far or any other party and when asked about the document, a Chia Far company official claimed to have "'forgotten about the [sole agency contract']." Id. at 18 (citing the Verification Report at 7). In discussing the contract, Commerce states that Chia Far, other than through "naked assurances," did not give a convincing explanation of why it argued that the agreement was not in effect during the period of review and did not provide rebuttal information after verification that it had promised. Id. at 20-21. While Chia Far argued to Commerce that the absence of commission payments in the ledgers showed that the sole agency ended and that no such payments were made after the middle of 1995 both in its brief and during the April 23, 2004, oral argument, Commerce responded that the ledgers were not dispositive because the customer could have been "compensated in other ways." Id. at 21.

In addition to the explicit principal/agency agreement, Commerce identified correspondence concerning material terms of sale between LM and Chia Far which identified the end-customer, unlike Chia Far's transactions with other U.S. customers. According to Commerce, the end-customer knew of Chia Far's identity and Chia Far played an active role in negotiations with the end-customer. For example, Commerce states in the verification report that in some correspondences in 2001 from Chia Far address Mr. Kung, President of LM, as "[Uncle Steve]" and another employee of the company, Jill Tale of Franklin, as "[Sister Jill]," both of which Chia Far exemplifies as terms of "familiarity and affection and in this context, not terms of a [familial bond]." Verification Report at 5. Commerce found Chia Far to be affiliated with LM because of the degree of its involvement with the subject merchandise sales process of LM and with LM's marketing of the subject merchandise, and its high degree of involvement with

22

LM's customers during the period of review. Defendant's Response at 12; see Ta Chen Stainless Steel Pipe, 23 CIT at 805-18.

**c**
**Commerce Acted in Accordance with Law in**
**Affording Lucky Medsup's Name Business Proprietary Treatment**

Allegheny argues that LM's name should have been disclosed because LM was identified as Chia Far's affiliate and agent, not customer. Allegheny's 56.2 Motion at 14-15.

Despite its finding of a principal/agent relationship between LM and Chia Far, Commerce denied Allegheny's request to make LM's name public. Commerce argued that, under 19 C.F.R.§ 351.304(a)(2)(I), there is no limitation on a respondent's rights to protect the names of customers who also have other commercial roles, such as agent. In this case, Commerce argued there was no reason to believe that LM was no longer acting as a customer even if it was affiliated with Chia Far. LM's participation in other commercial roles as selling agent in Chia Far's importation of the subject merchandise did not eclipse Commerce's obligation to keep confidential the identity of Chia Far's largest customer. Defendant's Response at 15. Chia Far said during the April 23, 2004, oral argument that it agreed with Commerce that LM's name should be afforded proprietary treatment.

Commerce's decision, finding that LM's name should remain confidential, is in accordance with the law. Pursuant to 19 U.S.C. § 1677f(b)(2) (2002),

> [if the administering authority or the Commission determines, on the basis of the nature and extent of the information or its availability from public sources, that designation of any information as proprietary is unwarranted, then it shall notify the person who submitted it and ask for an explanation of the reasons for the designation. Unless that person persuades the administering authority or the Commission that the designation is warranted, or withdraws the designation, the

23

administering authority or the Commission, as the case may be, shall return it to the party submitting it.

In a case in which the administering authority or the Commission returns the information to the person submitting it, the person may thereafter submit other material concerning the subject matter of the returned information if the submission is made within the time otherwise provided for submitting such material.

There are two applicable regulations for the treatment of business proprietary material in this context. First, 19 C.F.R. § 351.105(c)(6) (2002) establishes that Commerce normally will consider factual information to be business proprietary information, if so designated by the submitter: "[n]ames of particular customers, distributors, or suppliers." Second, 19 C.F.R. § 351.304(a)(2)(I) (2002), provides that Commerce "will require that all business proprietary information presented to, or obtained or generated by, [it] during a segment of a proceeding be disclosed to authorized applications," except for "[c]ustomer names submitted in an investigation." Here, LM's name has been fully protected pursuant to an administrative protective order because LM is Chia Far's largest U.S. customer. Even though Commerce has found that LM is an affiliate of Chia Far, that does not mean that it cannot keep its confidential treatment designated as an "affiliated customer."[12] LM's potential role as selling agent does not prejudice its classification as customer, and thus, warrants it protection as business proprietary information. Commerce acted in accordance with the law in affording LM confidential treatment.

---

[12] In Timken Co. v. United States, 240 F. Supp. 2d 1228 (CIT 2002) and Tung Mung Dev. Co. v. United States, Slip Op. 01-83, 2001 Ct. Intl. Trade LEXIS 94 (July 3, 2001), customers who are affiliates are referred to as "affiliated customers" and have been give business proprietary treatment in the public, published Slip Opinions.

**2**
**Commerce Accurately Applied Total Adverse Facts Available to Sales Made to Other U.S. Customers and its Decision Is Supported by the Evidence on the Record.**

Chia Far claims that it was truthful in its responses to all of Commerce's requests for information and cooperated to the best of its ability, thus not warranting the use of adverse facts available ("AFA") by Commerce. Chia Far claims that its responses were neither misleading nor did it prevent Commerce from exploring affiliation through examining the principal/agent relationship in a timely fashion. Plaintiff argues that "simple inadvertence is insufficient for application of an adverse inference," thus arguing that Commerce was not justified in using adverse facts available. Chia Far's 56.2 Motion at 26 (citing Nippon Steel Corp. v. United States, 24 CIT 1158, 1171 (2000)). Conceding that one statement in its response was misleading, Chia Far claims that this statement and others like it at verification were not intended to mislead Commerce. Chia Far claims, instead, that its President did not recall the existence of the document signed in 1994 that established the principal/agent relationship between it and LM. In fact, Chia Far states: "[w]ho among us remembers every document we signed seven years ago? Particularly when such a document ceased to be effective five years ago!" Chia Far's 56.2 Motion at 25. Chia Far says that it "simply could not give what it did not possess." Chia Far's Reply at 12 (emphasis in original). Chia Far further argues that Commerce never notified it that its submissions were deficient or that its deficiencies would lead to the use of AFA.

Furthermore, Chia Far argues that it failed to respond to Allegheny's June 18, 2001, letter which proffered the sole agency contract because Commerce refused to accept the pre-POR 1994-1998 commission ledgers, because they were pre-POR; so, "in Chia Far's mind there was

no point to submitting the data." Chia Far's 56.2 Motion at 11. Chia Far further claims that "it could not 'have complied' with Commerce's demand that it report its principal/agent relationship in the POR – there was simply nothing to report!" Chia Far's Reply at 4. Chia Far recorded all of its commission payment, which it paid to agents but not customers, in its commission ledgers; if Commerce had paid more attention to this, argues Plaintiff, Chia Far's position would have been vindicated. Id. at 13.

Allegheny claims that Commerce correctly applied AFA, because Chia Far failed to meet its burden of production and in turn to aid in creating an adequate record. Allegheny argues that the record shows sufficient evidence that Chia Far and LM had a principal/agent relationship and did not provide to Commerce information concerning sales to the first unaffiliated U.S. customer. Allegheny claims that by Chia Far failing to submit its constructed export price ("CEP") sales even in its June 4, 2001, supplemental response, it did not cooperate to the best of its ability, and thus greatly impeded Commerce's investigation. Furthermore, Allegheny asserts that, under 19 U.S.C. § 1677m(d), Commerce gave Chia Far adequate opportunities to revise its response and thus imposed AFA in accordance with the law.

Commerce argues that it correctly fulfilled the preconditions for imposing AFA because it found that Chia Far failed to cooperate by not acting to the best of its ability, pursuant to 19 U.S.C. § 1677e(b). When Commerce determines that a response to a request for information does not comply with the request, 19 U.S.C. § 1677m(d) provides for Commerce to inform the party of the deficiency and give the party the chance to remedy or explain the deficiency. Commerce, here, claims that it had no reason to believe or suspect affiliation between Chia Far and the U.S. Customer, LM. Even though Commerce had no knowledge of Chia Far's affiliation

26

with LM, Commerce had repeatedly asked Chia Far for such information throughout the review, but Chia Far had stated in its initial, supplemental, and follow-up supplemental responses that it was not affiliated with any U.S. customers.

After Allegheny submitted the sole agency contract to Commerce in its letter, dated June 18, 2001, Commerce points out that "[t]he record clearly demonstrates that Chia Far failed to provide Commerce with a copy of its sole [agency agreement with LM] that evidenced Chia Far's actual or potential control over its U.S. customer, [LM]." Defendant's Response at 13. Commerce found that Chia Far could have easily provided the document because it was in the best position to know its own business and respond to the request. Id. at 31 (citing Issues and Decision Memorandum at 32). In addition, Chia Far did not rebut Allegheny's June 18, 2001, submission though it had told the verification team that it was going to do so. Chia Far made unsubstantiated comments that the verification team's comments dissuaded it from producing the documents, but Commerce argues it was really because, as Chia Far stated in its 56.2 Motion, "it could not find the hoped-for document." Defendant's Response at 35. Commerce concluded that the use of AFA was strongly justified when Chia Far asserted that it had "forgotten" about the sole agency agreement, ignored specific requests for producing any contracts with LM initially and in subsequent letters[13], and failed effectively to rebut the continued legal effect of the document, even with notice that the contract was material to the margin's analysis. Id. at 13, 29.

Chia Far's consistent denials of a principal/agent relationship coupled with its failure to

---

[13] Commerce describes in a footnote that Chia Far states in its brief that because LM's name was double-bracketed it "did not know exactly what Commerce was attempting to verify from Petitioner's June 18 submission." Defendant's Response at 32. Commerce claims, however, that this claim is contradicted by Chia Far's May 17, 2002, letter and its 56.2 Motion as it claims that its President could not remember signing the contract. Id.

rebut, clarify, or correct Allegheny's June 18, 2001, submission, Commerce argues, establishes the existence of a principal/agent relationship between Chia Far and LM. Thus, because Chia Far did not provide Commerce with accurate and complete information and instead reported inaccurate and misleading information, Commerce determined that there was noncompliance and employed the use of adverse facts available.

Commerce is obligated to calculate antidumping margins in the most accurate way possible. Rubberflex SDN. BHD. v. United States, 23 CIT 461, 469 (1999). To this end, the respondent must provide Commerce with the most accurate, credible, verifiable information. See Gourmet Equip. Corp. v. United States, 24 CIT 572, 574 (2000). Ultimately, the burden of creating an adequate record lies with the respondents, not Commerce. Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 936 (1992). If Commerce determines that it is unable to verify the respondent's submission, it may substitute for the information submitted by the respondents, facts otherwise available. 19 U.S.C. §1677e(a)(2)(A) & (D) (2001)[14]. The imposition of facts available in trade remedy proceedings is the "only incentive to foreign exporters and producers to respond to Commerce questionnaires." SAA at 868. The requirements of 19 U.S.C. §1677e(a), however, are subject to 19 U.S.C. § 1677m(d) (2001)[15]:

_____

[14] 19 U.S.C. § 1677e(a)(2)(A) & (D) provide that if an interested party or any other person "withholds information that has been requested by the administering authority or the Commission under this subtitle" or "provides such information but the information cannot be verified as provided in section 1677m(I) of this title, the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle."

[15] Also pursuant to 19 U.S.C. § 1677e(a), "the administering authority and the Commission shall, subject to section 1677m(d), use the facts otherwise available in reaching the applicable determination under this subtitle."

If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either–

(1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or

(2) such response is not submitted within the applicable time limits,

then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

See Ta Chen Stainless Steel Pipe, 23 CIT at 819. If Commerce acts in accordance with its

statutory requirements for the imposition of total facts available, but finds that

an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from –

(1) the petition;
(2) a final determination in the investigation under this subtitle,
(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
(4) any other information placed on the record.

19 U.S.C. § 1677e(b); See Gourmet Equip., 24 CIT at 577.  Commerce is under the obligation to

articulate its reasons for finding that a party did not act to the best of its ability and explain why

the information missing is significant to the review. Mannesmannrohren-Werke AG v. United

States, 23 CIT 826, 839 (1999); see Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382

29

(Fed. Cir. 2003). This court will uphold Commerce's affirmative finding that the party could have complied with the information request if it is based on substantial evidence. See Pac. Giant, Inc. v. United States, 223 F. Supp. 2d 1336, 1342 (CIT 2002).

When a respondent fails to respond to Commerce's requests and the information it requested is material to the investigation, this court previously has found such behavior to be unreasonable and the use of AFA appropriate. See Branco Peres Citrus, S.A. v. United States, 173 F. Supp. 2d 1363, 1371-74 (CIT 2001); Am. Silicon Tech. v. United States, 240 F. Supp. 2d 1306, 1308-1311 (CIT 2002). Furthermore, it is within Commerce's discretion to choose the sources and facts on which it will rely to support its use of AFA. F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F. 3d 1027, 1032 (Fed. Cir. 2000). At issue in this case is whether Commerce's levying of AFA is in accordance with the law as the use of total facts available is not in dispute.

Here, Commerce acted in accordance with the law. From the inception of this investigation, Chia Far consistently denied any agency relationship with LM. It was only during verification, subsequent to Allegheny's submission of the sole agency contract between Chia Far and LM in its June 18, 2001, letter to Commerce, that Chia Far "acknowledged the existence of [the contract] and stated the company's denial of the [contract's existence] was inadvertent." Verification Report at 7. The court agrees with Commerce that it appears that Chia Far possessed "actual notice" of this exclusive agency contract that was material to Commerce's margin analysis and failed to submit the information, even though it was in the best position to know its own business operations. Defendant's Response at 29. In a questionnaire, Commerce even specifically asked Chia Far to produce information concerning any contracts or special

30

arrangement with LM and in its response (in which it seems to have acknowledged the request), Chia Far stated that it and "this customer [LM] do not have, did not have in the POR, and did not have prior to the POR a principal/agent relationship, either in fact (via an agency contract) or in theory." Chia Far's May 17 Letter to Commerce.

Commerce presented Chia Far an additional opportunity, its May 25, 2001, supplemental questionnaire, to respond to Allegheny's allegations of affiliation and present this information to Commerce; Commerce even asked specific questions to Chia Far concerning this matter. Nevertheless, in its June 4, 2001, response to the supplemental questionnaire, Chia Far, stated once again that it "had no contracts with [Lucky Medsup] which established any relationship other than that of customer, i.e., an order confirmations [sic] establishing contract for sales." Supplemental Questionnaire Response of Chia Far Industrial Factory Co., Ltd. (June 4, 2001) at 7. Chia Far's justifications for not providing the information are insufficient. Whether or not it had "forgotten" about the contract or its President did not recall signing such a document in 1994, the failure to tell Commerce the truth is inexcusable even if it was "inadvertent."

Commerce gave Chia Far adequate opportunities to present this information and rebut Allegheny's June 18, 2001, as discussed *supra*; it was within Commerce's discretion as to whether it would consider the commission ledgers that Chia Far attempted to present as rebuttal during verification. Thus, this court finds that Commerce acted in accordance with law in its imposition of AFA.

**3**
**Commerce Accurately Applied Total Adverse Facts Available to Sales Made to Other U.S. Customers and its Decision Is Supported by the Evidence on the Record.**

Chia Far also challenges the 21.10% AFA rate applied by Commerce, claiming that the rate is incorrect and punitive.

Allegheny, however, while arguing that Commerce correctly imposed total AFA, claims that Commerce did not impose the correct total AFA *rate* on Chia Far, alleging the 21.10% was insufficient as a deterrent. Allegheny deems insufficient Commerce's explanation for imposing the 21.10% *ad valorem* rate that "[t]hough nothing on the record . . . indicates that the rate of 34.95% is unreliable per se, we agree with Chia Far that, absent an allegation of middleman dumping, another dumping margin may be more appropriate." Issues and Decision Memorandum at 37. Allegheny argues that 19 U.S.C. § 1677e(b) charges Commerce "to employ facts adverse enough to create a proper deterrent to non-cooperation with its antidumping investigations and reviews, while still achieving a reasonable margin," but claims that the 21.10% rate imposed by Commerce does not meet the goals of the statute. Allegheny's 56.2 Motion at 16 (citing F.lli De Cecco, 216 F.3d at 1032. Petitioners bolster their assertions by highlighting Chia Far's "outright nonresponsiveness" and "deception" in providing information during the administrative process – they claim that Plaintiff's general reticence warrants the use of AFA and the higher dumping rate. Lastly, concerning the imposition of total AFA on all of Chia Far's U.S. sales and U.S. customers, Petitioners argue that Commerce correctly levied total AFA on all U.S. sales to all Chia Far's U.S. customers as LM made up such a large percentage of its U.S. sales; the fact that Chia Far was reticent about 92% of its U.S. sales, argue Petitioners, warrants such a blanket rate.

Commerce defends the application of the 21.10% margin on Chia Far that it had placed

on YUSCO in the original investigation, <u>Notice of Final Determination of Sales at Less Than

Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan</u>, 64 Fed. Reg. 30,592, 30,599

(June 8, 1999) ("Final Determination 1999").[16] Commerce claims that the rate it chose is correct

[16] Defendant stated in its Response at 40 that

> [i]n this case, Commerce's choice of a 21.10 percent dumping for its application
> of an adverse inference to Chia Far's sales represents the "all others" margin from
> the original antidumping investigation from Taiwan. <u>Notice of Final
> Determination of Sales at Less Than Fair Value: Stainless Ste Sheet and Strip
> from Taiwan</u>, 64 Fed. Reg. 30592 (June 8, 1999).

Defendant further said that:

> Commerce properly exercised its discretion when it decided that a rate of 21.10%
> was the "most appropriate basis for facts available" with respect to Chia Far.
> <u>Issues and Decision Memo</u> at 37. PD at 212; fiche 84; frame 31; Tab 18.  That
> rate was derived from the original investigation, where Commerce applied a
> combination rate of 34.95% to respondent YUSCO. The rate was a weight-
> averaged combination of the 21.10% rate that applied to YUSCO, and a separate
> dumping rate of 36.44% assigned to sales by YUSCO through a middleman, Ta
> Chen. <u>Id.</u>  Commerce obtained the 36.44% rate applied to YUSCO by adding
> YUSCO's rate of 21.10% to the middleman dumping rate of 15.34% for YUSCO
> sales through Ta Chen. In this case, Commerce properly decided not to apply the
> 15.34% middleman dumping rate to Chia Far as adverse facts available because
> Commerce verified that Chia Far made no sales to the U.S. through a middleman
> during the POR.

<u>Id.</u> at 41.

In the Issues and Decision Memorandum at 37, Commerce stated that

> [t]he rate of 34.95% is a weight-averaged combination rate of 21.10% assigned to
> YUSCO in the original investigation and a middleman dumping rate of 15.34%
> assigned to YUSCO's sales through Ta Chen . . . . [W]e are assigning Chia Far as
> AFA 21.10%, the rate assigned to YUSCO in the original investigation.

Upon questioning regarding this discrepancy by the court at oral argument, Commerce
stated that the court had "pointed out an error in our brief."  Defendant stated the 21.10%

because it has "broad discretion to choose which sources and facts" on which it will rely and here it found the rate was "rationally related to sales of the subject merchandise and would further encourage Chia Far's cooperation in the future." Defendant's Response at 14. The rate assigned to Chia Far is based on "secondary information"[17] because Chia Far had submitted inaccurate and unuseable sales information. Under the SAA, Commerce is supposed to corroborate the information to ensure the probative value of the evidence and in this case the information was, Commerce argues, corroborated in the less than fair value investigation in which it examined the accuracy and adequacy of the price-to-price information in the petition and corroborated the price-to-price petition comparison.

In applying the discretionary rate, Commerce explains that the 34.95% rate is a weight-averaged combination rate of 21.10% assigned to YUSCO in the original investigation plus a middleman dumping rate of 15.34% which had been assigned to YUSCO's sales through Ta Chen. Commerce applied the 21.10% rate because it verified that Chia Far had no sales through a middleman during the POR. Defendant's Response at 41. Commerce disagrees with Chia Far, however, concerning the applicability of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Rescission of Administrative Reviews, and Notice of Intent To Revoke Orders in Part, 66

_____

erroneously referenced in its brief was the dumping rate specifically for YUSCO minus the effective middleman dumping. Defendant then orally corrected the error.

[17] "Secondary information" is described in the SAA at 870 as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."

Fed. Reg. 8,931, 8,933-34 (Feb. 5, 2001) as the appropriate basis for facts available and assigned the AFA 21.10% rate granted to YUSCO during the original investigation.

The Federal Circuit has stated that it is within Commerce's discretion to choose the sources and facts on which it draws an adverse inference. F.Lii De Cecco, 216 F.3d at 1032. The AFA rate, additionally, is supposed to be an accurate estimate of the actual rate combined with a deterrent for non-compliance, particularly with a view to future proceedings. Id.; see Nat'l Steel Corp. v. United States, 20 CIT 100, 103-04 (1996). Commerce's discretion when dealing with uncooperative respondents is broad. Ferro Union, Inc. v. United States, 23 CIT 178, 204-05 (1999). In selecting a reasonable AFA rate, however, Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance, rather than creating an overly punitive result. Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004); see F.Lii De Cecco, 216 F.3d at 1032. Thus, Commerce's discretion is not unbounded. F.Lii de Cecco, 216 F.3d at 1032.

Pursuant to 19 U.S.C. § 1677e(b), Commerce may rely on information derived from the petition, a final determination in an investigation, previous reviews, and any other information placed on the record to draw its adverse inference. Echoing the statute, the applicable regulation, 19 C.F.R. § 351.308(c) (2001), states that an adverse inference may include reliance on:

> (1) Secondary information[18], such as information derived from:

> > (I) The petition;

---

[18] As stated above, "secondary information" is described in the SAA at 870 as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."

(ii) A final determination in a countervailing duty investigation or an antidumping investigation;

(iii) Any previous administrative review, new shipper review, expedited antidumping review, section 753 review, or section 762 review; or

(2) Any other information placed on the record.

Commerce is also bound by a corroboration[19] requirement pursuant to 19 U.S.C. § 1677e(c):

> [w]hen the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

The applicable regulation is 19 C.F.R. § 351.308(d):

> Under section 776(c) of the Act, when the Secretary relies on secondary information, the Secretary will, to the extent practicable, corroborate that information from independent sources that are reasonably at the Secretary's disposal. Independent sources may include, but are not limited to, published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review. Corroborate means that the Secretary will examine whether the secondary information to be used has probative value. The fact that corroboration may not be practicable in a given circumstance will not prevent the Secretary from applying an adverse inference as appropriate and using the secondary information in question.

This corroboration requirement intends for the AFA rate to be a reasonably accurate estimate of the respondent's actual rate with a built-in increase intended as a deterrent, but a tempered deterrent. F.Lii de Cecci, 216 F. 3d at 1032.

In this case, the 21.10% rate imposed by Commerce is in accordance with the law. Commerce derived this 21.10% rate by taking the 34.95% weight-averaged combination rate

---

[19] "Corroboration" requires Commerce to assess that the information it is using "has probative value." SAA at 870.

assigned to YUSCO in the original investigation minus the middleman dumping rate YUSCO had been assigned, since Commerce found no middleman dumping for Chia Far. See Final Determination 1999, 64 Fed. Reg. at 30592.  Taking YUSCO's rate was consistent with 19 U.S.C. § 1677e(b)(2) and 19 C.F.R. § 351.308(c)(1)(ii), which allow Commerce to rely on a "final determination" in the "investigation" at issue.  Because Commerce used YUSCO's margin from the original investigation, 19 U.S.C. § 1677e(c) and 19 C.F.R. § 351.308(c) regard this information as secondary information which must meet the corroboration requirement.  The information Commerce used to arrive at Chia Far's AFA rate was already corroborated in the original investigation. Issues and Decision Memorandum at 37; Defendant's Response at 41. Commerce may act within its discretion so long as the rate chosen has a relationship to the actual sales information available. Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1340 ( Fed. Cir. 2002).  Furthermore, the court agrees with Commerce that the AFA rate imposed on Chia Far is reasonable given the circumstances of the AFA imposition.

**B**
**YUSCO**

**1**
**Commerce's Determination Not to Apply AFA to**
**YUSCO Is in Accordance with Law**

Allegheny argues that YUSCO's classification of sales by market is severely inadequate and thus Commerce was unable to make a fair dumping analysis based on that information. Allegheny claims that Commerce should apply AFA in this review as it did previously in the original investigation because YUSCO kept the same internal sales order classification system which was deemed insufficient by this court in Tung Mung Dev. Co. v. United States, 25 CIT

752 (2001) and Allegheny Ludlum Corp. v. United States, 24 CIT 452 (2000). Specifically, Allegheny states that YUSCO knew or had reason to know that some of its so-called UZ sales through Ta Chen, its middleman, and its U* sales through its affiliated parties, Yieh Hsing and Lien Kang, exported to third countries were misclassified as home market sales. Allegheny thus suggests that YUSCO should manually reclassify all UZ and U* sales as home market sales or exported subject merchandise. Allegheny contends that Commerce discovered at verification that YUSCO records information required to classify sales according to their destination and end use, but withheld that information. By continuing to use the same sales order system, Allegheny posits, YUSCO misrepresents sales.

YUSCO, on the other hand, argues that the use of AFA must be rejected because it accurately reported its home market sales in light of Commerce's and this court's holding concerning the original investigation in Tung Mung and Allegheny Ludlum. With regard to the accuracy of its reporting, YUSCO did not rely solely on its internal order system to identify the appropriate classification of its sales, but instead used it "only to make the first cut of identifying the potential universe of sales that need[ed] to be reported." Defendant-Intervenor Yieh United Steel Corp.'s Response Brief in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("YUSCO's Response to Allegheny's 56.2 Motion") at 15. In the previous investigation, Commerce had deemed YUSCO uncooperative because of its sole reliance on its internal order system and its withholding of the U* and UZ sales from its home market sales database. Id. at 16. Here, YUSCO's sales classification and reporting withstood the scrutiny of Commerce's verification process.

Commerce agreed with YUSCO citing that YUSCO accurately reported the necessary

home market sales required for the calculation of the dumping margin. Commerce explained that its verification methodology of random sampling, which it has used for "decades," consists of selecting individual sales from the database and requiring the respondent to produce supporting documentation; the amount of resources required to test every entry would not be feasible. Defendant's Response at 44-45. Through sampling, Commerce claims that it thoroughly tested the accuracy of YUSCO's home market reporting by looking at the home market database. Id. at 46. Commerce found that YUSCO rectified the reporting deficiencies that were in the original investigation in accordance with the April 24, 2001, supplemental questionnaire, Antidumping Administrative Review on Stainless Steel Sheet and Strip in Coils from Taiwan: Questionnaire regarding Designation of Home Market Sales, and Allegheny Ludlum. Issues and Decision Memorandum at 7. Commerce argues, contrary to Allegheny's assertions, that it verified that YUSCO did not misreport third country sales as home market sales. Furthermore, Commerce appeared to find no discrepancies with the facts provided by YUSCO during verification, so Commerce agreed with YUSCO that the use of AFA was unwarranted.

Commerce has broad discretion to develop and select its methodology for verification as long as there is substantial evidence on the record to support the choice. See Hercules, 11 CIT at 726; see also Floral Trade Council v. United States, 17 CIT 392, 399 (1993); Am. Alloys, 30 F.3d at 1475. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo, 383 U.S. at 620. This court may not reweigh the evidence or substitute its own judgment for that of the agency. Fuyao Glass Indus. Group Co. v. United States, Slip. Op. 03-169 at 28, 2003 Ct. Int'l Trade LEXIS 171 (Dec. 18, 2003) (citing China Nat'l Mach. Imp. & Exp.

Corp. v. United States, 264 F. Supp. 2d 1229, 1240 (2003)).  In applying the "substantial

evidence" standard, "the court affirms Commerce's factual determinations so long as they are

reasonable and supported by the record as a whole, even if there is some evidence that detracts

from the agency's conclusions." Olympia Indus. v. United States, 22 CIT 387, 389 (1998) (citing

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).  As long as the

agency's methodology and procedures are reasonable means of effectuating the statutory purpose,

and there is substantial evidence in the record supporting the agency's conclusions, the court will

not impose its own views as to the sufficiency of the agency's investigation or question the

agency's methodology. Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05

(1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

In this case, Commerce used its established sampling verification methodology, selecting

at random individual sales from the database and requiring the respondent to support the data

with original, contemporaneous documents. Defendant's Response at 44; See, e.g.,

Mannesmannrohren-Werke, 23 CIT at 826.  Pursuant to 19 U.S.C. § 1677f-1 (2001)[20],

_____

[20] 19 U.S.C. § 1677f-1 states that

> (a) In general. For purposes of determining the export price (or constructed
> export price) under section 1677a of this title or the normal value under
> section 1677b of this title, and in carrying out reviews under section 1675
> of this title, the administering authority may–
>
>> (1) use averaging and statistically valid samples, if there is a
>> significant volume of sales of the subject merchandise or a
>> significant number or types of products, and
>>
>> (2) decline to take into account adjustments which are insignificant
>> in relation to the price or value of the merchandise.
>
> (b) Selection of averages and samples.  The authority to select averages

40

Commerce has the authority to select the appropriate samples as long as the samples are "representative of the transactions under investigation." See Federal-Mogul Corp. v. United States, 20 CIT 234, 253 (1996). In addition, the Court has consistently recognized that Commerce has been given broad discretion in its sample selection methodology. Id.; Nachi-Fujikoshi Corp. v. United States, 19 CIT 914, 918 (1995). Commerce here used sampling to verify YUSCO's sales listing and thus confirmed that YUSCO's reporting methodology did not yield errors or misclassified sales. Commerce determined that YUSCO rectified its reporting deficiencies with respect to U* and UZ sales in compliance with Commerce's April 24, 2001, supplemental questionnaire. Contrary to Allegheny's assertions, at verification, Commerce "conducted extensive tests of YUSCO's reported home market databases in order to ascertain the accuracy and completeness of YUSCO's reporting" and found no discrepancies. Issues and Decision Memorandum at 7. Thus, Commerce's conclusion that YUSCO's reporting methodology stood muster and its decision to not support the use of AFA against YUSCO is in accordance with law.

**2**

**Commerce's Determination Not to Collapse YUSCO and its Affiliates in the Home Market Is in Accordance with Law**

Allegheny argues that Commerce should collapse YUSCO and certain affiliated parties, Yieh Mau Corporation ("Yieh Mau") and Yeoh Yih Steel Company Limited ("Yeoh Yih"), in the

and statistically valid samples shall rest exclusively with the administering authority. The administering authority shall, to the greatest extent possible, consult with the exporters and producers regarding the method to be used to select exporters, producers, or types of products under this section.

home market under 19 C.F.R. 351.401(f). Allegheny states that Commerce properly found that YUSCO, Yeoh Yih, and Yieh Mau are affiliated parties. Allegheny's 56.2 Motion at 47. In addition to being affiliates, however, Allegheny argues that YUSCO's and its affiliates' relationship fulfilled the criteria for collapsing.

YUSCO argues that Commerce was correct to refrain from collapsing it with its affiliates. YUSCO stresses that the evidence shows that there was no *significant* potential of manipulation of production or price between itself and Yieh Mau and Yeoh Yih, respectively. See YUSCO's Response to Allegheny's 56.2 Motion at 23 (emphasis added).

Commerce determined that the record evidence did not warrant collapsing YUSCO and its affiliated parties. Commerce prepared a document entitled Decision Memorandum: Whether to Collapse Yieh United Steel Corporation ("YUSCO") and Yieh Mau Corporation ("Yieh Mau") and Yeoh Yih Steel Company Limited Into a Single Entity, from Edward C. Yang, Director Office 9, for Joseph A. Spetrini, Deputy Assistant Secretary for Import Administration, Group III (Feb. 4, 2002), Defendant's Confidential Version Appendix at 19 ("Collapsing Memorandum"), to examine these issues.[21] Commerce considered the familial and equity relationships as well as the production facilities and capabilities of each company in its collapsing analysis. Furthermore, its verification did not reveal any inconsistencies in the information submitted concerning YUSCO's corporate structure nor any further evidence

---

[21] Commerce states in order to collapse companies it must find: first, that the companies are affiliated under 19 U.S.C. § 1677(33) and second, under 19 C.F.R. § 351.401(f), that the affiliated entries have production facilities for similar or identical products so that substantial retooling would be unnecessary to restructure manufacturing priorities and that there exists the significant potential for manipulation of price or production through the affiliates. Collapsing Memorandum at 1.

warranting collapsing of the entities. Issues and Decision Memorandum at 19. Commerce found that the record evidence showed that no manipulation of price or production would be possible without substantial retooling. Thus, Commerce determined that it would not collapse YUSCO and its affiliated parties.

Commerce's decision to not collapse YUSCO and its affiliates is supported by substantial evidence. Pursuant to 19 U.S.C. § 1677(33) and 19 C.F.R. § 351.401(f) (2001), Commerce may assign multiple affiliated entities a single antidumping margin in antidumping investigations; it "collapses" the companies into one and then calculates a single weighted-average margin for those affiliated companies. Koenig & Bauer-Albert AG v. United States, 24 CIT 157, 158 (2000); see Queen's Flowers de Colom. v. United States, 21 CIT 968, 971 (1997); see also Import Administration Antidumping Manual, U.S. Department of Commerce, Chapter 7 at 24-25 (1997). "Commerce's collapsing practice has been approved by the court as a reasonable interpretation of the antidumping statute." Koenig & Bauer-Albert AG, 24 CIT at 160.

When Commerce examines companies, it first determines whether parties are affiliated under 19 U.S.C. § 1677(33). See Ta Chen Stainless Steel Pipe, 23 CIT at 808. After finding affiliation, Commerce then applies the collapsing regulation, 19 C.F.R. § 351.401(f), which provides:

> (1) In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.
>
> (2) In identifying a significant potential for the manipulation of price or

production, the factors the Secretary may consider include:

> (I) The level of common ownership;
>
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

Koenig & Bauer-Albert AG, 24 CIT at 159 n. 4; Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1362 n. 4 (2000). Commerce thus looks to see whether producers share "production facilities for similar or identical products." 19 C.F.R. § 351.401(f)(1); Allied Tube, 24 CIT at 1374. Finally, Commerce determines whether one affiliated party has the "significant potential for the manipulation of price or production" of the other. 19 C.F.R. § 351.401(f)(1); see Allied Tube, 24 CIT at 1374. For determining "significant potential for manipulation," the regulation states that Commerce "may consider" factors such as level of common ownership, presence of common board members, and the extent to which the companies are intertwined by examining sales information, production and pricing decisions, shared facilities or employees, or significant transaction between the companies. Allied Tube, 24 CIT at 1374; see 19 C.F.R. § 351.401(f)(2). While the list is not exhaustive, Commerce must determine that there is more than "mere affiliation" between the companies. AK Steel Corp. v. United States, 22 CIT 1070, 1080 n. 22 (1998), *aff'd in part*, *rev'd on other grounds*, 226 F.3d 1361 (Fed. Cir. 2000).

First, in the Final Determination 1999, 64 Fed Reg. at 30,592, Defendant found affiliation existed between YUSCO and Yieh Mau within the meaning of 19 U.S.C. § 1677(33). In its Section A Questionnaire Response of September 28, 2000, YUSCO reported Yieh Mau and

Yeoh Yih as affiliated parties. Collapsing Memorandum at 2. Commerce, thus, established the first part of the collapsing analysis.

Second, concerning the elements of 19 C.F.R. § 351.401(f), Allegheny argues that YUSCO and its affiliates (1) shared a common level of ownership; (2) shared common board members whose family connection constituted "evidence of control"; (3) had overlapping production capabilities as both processes convert stainless steel black coils into the subject merchandise; (4) had intertwined operations given the family control and sale of coiled sheet and strip and stainless steel black products between them, respectively. Allegheny's 56.2 Motion at 47. Allegheny claims that Commerce's reasoning, in not determining that the "totality of the circumstances" warranted collapsing of the two entities, is not supported by substantial evidence. Id. at 47-48.

YUSCO claims that Allegheny's analysis focuses disproportionately on certain factors. It argues that Allegheny ignores that Commerce and this court have determined that collapsing should occur based on the "totality of circumstances." YUSCO's Response to Allegheny's 56.2 Motion at 24.

Commerce examined YUSCO's two affiliates, Yieh Mau and Yeoh Yih, separately. Commerce found that Yieh Mau is a "finishing operation which performs slitting, edge trimming, grinding, and polishing of cold-rolled coils" and "does not have the production capability to produce stainless steel sheet and strip billets or hot-rolled coil; therefore, it is not regarded as producer of the subject merchandise." Collapsing Memorandum at 4. Because of the nature of Yieh Mau's production facilities and the type of product it manufactures, Commerce found that substantial tooling would be required for Yieh Mau to produce the stainless steel sheet

45

and strip in coils that YUSCO produces.  Commerce thus terminated the analysis with respect to Yieh Mau.

With regards to Yeoh Yih, Commerce determined that while YUSCO and Yieh Yih both perform "annealing & pickling, plate shearing, shearing, and solution hot-treatment, shot blasting and leveling" on their production lines, YUSCO also "performs slab casting, hot rolling, cold rolling, skin passes and tension leveling." Id. at 5.  Because of their differences in capacity, however, Commerce determined that Yieh Yih would require a cold-rolling mill to fulfill the stipulations of the regulation and this would be constitute substantial retooling. Defendant's Response at 48-50.  Therefore, Commerce found that Yeoh Yih did not meet the production facility/substantial retooling element of the collapsing analysis.[22]  In order to arrive at this conclusion, Commerce considered the remaining factor and sub-factors in the collapsing analysis.

Commerce examined the potential for manipulation of price or production by looking at

_____

[22] In the Collapsing Memorandum, Commerce did not explicitly undertake a 19 C.F.R. § 351.401(f)(1) "substantial retooling" analysis.  It instead included the "substantial retooling" analysis within its 19 C.F.R. § 351.401(f)(1)-(2) "price manipulation" analysis.  When asked about its methodology by the court during oral argument, Commerce said that the elements of the 19 C.F.R. § 351.401(f)(1)-(2) "price manipulation" analysis were "dispositive."  Commerce acknowledged that the "argument would go the other way if Commerce had decided to collapse and there were a challenge to that, then perhaps that would be the basis for the challenge."  Here, however, the question was whether Commerce's decision not to collapse was supported by substantial evidence and in addressing the fact that substantial retooling would have been required was in Commerce's view dispositive.

Commerce's explanation here satisfactorily addressed the elements of 19 C.F.R. § 351.401(f)(1)-(2) and provided evidence for its assertions.  While authority exists which says that Commerce should undertake separate 19 C.F.R. § 351.401(f)(1) "substantial retooling" and "price manipulation" analyses, see Slater Steels Corp. v. United States, 316 F. Supp. 2d 1368, 1371-74 (CIT 2004), Commerce's failure to do so in this case is, if error, harmless.

46

level of ownership, overlapping board members, production facilities, and the whether YUSCO's and Yeoh Yih's operations are interconnected. Commerce found that, though an individual, Mr. I.S. Lin, holds positions on the boards of both companies, his ownership amounts to only 14.1% of Yeoh Yih's stock. Collapsing Memorandum at 4-6. As noted above, Commerce found that while YUSCO and Yeoh Yih produce some of the same products, their capacity, particularly for certain products, does not warrant collapsing. Commerce also found, based on their submissions, that YUSCO and Yeoh Yih had no legal, business, or contractual arrangements; no shared facilities or employees; and had only one sale between them. Id. at 6. Thus, Commerce concluded that there was no significant potential for manipulation of price or production between YUSCO and Yeoh Yih.

Commerce abided by the statute and regulation, and properly determined not to collapse YUSCO, Yieh Mau, and Yeoh Yih. This court may not reweigh the evidence or substitute its own judgment for that of the agency. China Nat'l Mach., 264 F. Supp. 2d at 1240. "[T]he court affirms Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." Olympia Indus., 22 CIT at 389. Commerce's decision is thus supported by substantial evidence and is in accordance with the law.

**C**
**Ta Chen**

In the original investigation, Ta Chen was investigated as a possible middleman to YUSCO and Tung Mung in the U.S. market. Due to Ta Chen's lack of cooperation, Commerce placed on it a 15.34% *ad valorem* dumping margin on total AFA grounds. Allegheny thereafter

47

requested that Commerce investigate Ta Chen's alleged middlemen dumping by asking it to trace any and all of its sales of subject merchandise made during the POR from any Taiwanese producer to Ta Chen and Ta Chen's subsequent sale to the first unaffiliated U.S. customer.[23]  In this review, Ta Chen cooperated with Commerce.  Based on the information provided by Ta Chen as well as a Customs Query, Commerce requested of Customs, Commerce rescinded the first administrative review of Ta Chen because there were no entries of the subject merchandise during the POR.

**Commerce Determination to Rescind Ta Chen's Review Is in Accordance with Law**

Commerce argues that it rescinded the review because the record evidence shows that Ta Chen had no entries of the merchandise in this review during the POR.  Commerce, citing 19 C.F.R. § 351.213(d)(3), states that in order for it to conduct an administrative review, if there is an absence of entries, exports, or sales during the POR, it "may rescind" the administrative review.  Commerce claims that it based its decision on two things.  First, Ta Chen provided a certified statement stating that it had no entries of the merchandise at issue during the POR.  Issues and Decision Memorandum at 41; Defendant's Response at 50-51.  Second, on October 26, 2000, Commerce asked Customs to report if it had any information on coiled stainless steel sheet and strip from Taiwan manufactured/exported by Ta Chen which had been exported/entered during the POR. See U.S. Customs Data Query for Entries During the 1999-2000 Antidumping Duty Administrative Review on Stainless Steel Sheet and Strip in Coils from Taiwan, from Michael Panfeld, Senior Case Analyst, Office of AD/CVD Enforcement, to Rick

---

[23] Commerce requested this data because it was unable to verify this information in the original investigation's final determination.  It was the failed verification and Ta Chen's lack of cooperation that led to the imposition of the total AFA rate of 15.34%.

Johnson, Program Manager, Office of AD/CVD Enforcement (July 31, 2001), DPVA at 15.

Because shipment queries do not require negative reports, and Customs did not respond, Commerce's inquiry confirmed that Ta Chen did not enter merchandise after the suspension of liquidation in the original investigation. Id.

Allegheny argues that Commerce improperly treated U.S. sales during the POR as pre-suspension entries and in turn erroneously rescinded the review with respect to Ta Chen. Allegheny alleges that Commerce impeded its ability to determine the most accurate dumping margin and cash deposit rates by not updating the dumping margin as Allegheny had sought. Allegheny's 56.2 Motion at 63-64. Additionally, Allegheny faults Commerce for relying on the Customs Query, claiming that Ta Chen and not Commerce was required to provide adequate facts to compile the record.

Commerce correctly decided to rescind Ta Chen's review based on the fact that there were no entries of the merchandise at issue during the POR, regardless of whether there were sales. Pursuant to 19 C.F.R. § 351.213(d)(3) (2001), Commerce

> may rescind an administrative review, in whole or only with respect to a particular exporter or producer, if [Commerce] concludes that, during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be.

See Yancheng Baolong Biochem. Prods. Co. v. United States, 337 F. 3d 1332, 1333 (2003). The Federal Circuit in Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1371 (Fed. Cir. 2003) upheld Commerce's policy relating to its method of conducting annual reviews of antidumping orders: "where sales can be linked to customs entries, it is only entries within the period of review that are examined and used to calculate the cash deposit rates." See also

Antidumping Duties, 62 Fed. Reg. at 27,314. In Allegheny, the court expressed that Commerce's policy to hinge its review on the basis of entries rather than sales "merely implements its lawful regulations." 346 F.3d at 1372. Merchandise that entered the U.S. prior to the period of review is not "subject merchandise" within the meaning of 19 U.S.C. § 1677(25) (2001).[24] In this case, Commerce had a certified statement from Ta Chen as well as a Customs query, both of which provided evidence that there were no entries during the POR. Therefore, Commerce's decision to rescind the review with respect to Ta Chen is supported by substantial evidence.

------

[24] Pursuant to 19 U.S.C. § 1677(25), "[t]he term 'subject merchandise' means the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."

## VI
## Conclusion

Commerce's antidumping review determination in <u>Stainless Steel Sheet and Strip in</u>

<u>Coils from Taiwan: Final Results and Partial Rescission of Antidumping Duty Administrative</u>

<u>Review</u>, 67 Fed. Reg. 6,682 (Feb. 13, 2002) is supported by substantial evidence and is otherwise

in accordance with law.


                         <u>/s/ Evan. J. Wallach</u>

                              Judge

Dated: August 2, 2004
       New York, New York