# United States Court of Appeals for the Federal Circuit

06-1044, -1052

NORSK HYDRO CANADA, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant,

and

U.S. MAGNESIUM LLC,

Defendant-Appellant.

Eric C. Emerson, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellee.  With him on the brief were Gregory S. McCue and Michael T. Gershberg.  Of counsel was Meredith A. Rathbone.

Stephen C. Tosini, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant United States.  With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Jeanne E. Davidson, Deputy Director.  Of counsel on the brief was Ada E. Bosque, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

Jeffrey M. Telep, King & Spalding LLP, of Washington, DC, argued for defendant-appellant U.S. Magnesium LLC.  With him on the brief was Stephen A. Jones.  Of counsel was Joseph W. Dorn.

Appealed from:  United States Court of International Trade

Judge Donald C. Pogue

# United States Court of Appeals for the Federal Circuit

06-1044, -1052

NORSK HYDRO CANADA, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant,

and

U.S. MAGNESIUM LLC,

Defendant-Appellant.

_____

DECIDED:  December 14, 2006

_____


Before MICHEL, <u>Chief Judge</u>, PROST, <u>Circuit Judge</u>, and ELLIS,[*] <u>District Judge</u>.

ELLIS, <u>District Judge</u>.

This appeal concerns the interpretation of the countervailing duty laws and the division of authority between the two entities responsible for implementing these laws—the Department of Commerce ("Commerce") and the U.S. Customs and Border Protection ("Customs").  In this case, Customs collected duties on 1997 magnesium and magnesium alloy imports at too high a rate from appellee Norsk Hydro Canada, Inc. ("NHC").  Rather than liquidate countervailing duties against NHC at the proper 2.02% rate, Customs allowed some duties to be "deemed liquidated" at cash deposit rates ranging from approximately 3% to 7%.  The government pocketed the difference, and

---

[*]  The Honorable T.S. Ellis, III, District Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

as permitted by law, redistributed some of this amount to NHC's American competitors. NHC did not attempt to protest this overcharge by Customs at the time, choosing instead to wait several years until Commerce held an annual administrative review of the amount of the net countervailable subsidy provided to NHC, at which time NHC sought a setoff of the overcharge against duties due on its imports for a later year. Commerce rejected this request on the ground that it lacked legal authority to grant the setoff. NHC appealed this decision to the Court of International Trade, which agreed with NHC and remanded the matter to Commerce with instructions to grant the setoff. Following the remand, Commerce made the setoff under protest,[1] and the matter then returned to the Court of International Trade, which granted judgment for NHC on the administrative record. This appeal followed. We now reverse.

## I. Statutory Background

As an aid to understanding the issues presented, we summarize briefly the law governing the setting and collection of countervailing duties.

### A. Countervailing Duties and Subsidies

If the production of goods abroad is subsidized by a foreign government, the goods can be subject to a countervailing duty ("CVD") when imported[2] to the United States. 19 U.S.C. § 1671. In general, the goal of these duties is to protect American

---

[1] Specifically, Commerce stated, in an opinion that remains unpublished in the Federal Register pending resolution of this case, that it "respectfully disagrees with the Court's holding in Norsk 10/12/2004 Opinion and the Court's Remand Order" but that it has "complied with all the Court's instructions." Norsk Hydro Inc. v. United States and U.S. Magnesium LLC, Final Results of Redetermination Pursuant to Remand, unpublished disposition.

[2] In the jargon of customs law, a particular batch of imported goods is referred to as an "entry." This is not to be confused with the "date of entry," which is the time that a particular entry, or batch of goods, is imported into the United States.

06-1044, -1052                    2

firms from unfair competition by setting off the amount of certain export subsidies foreign firms selling goods in the United States receive from their government. The Secretary of Commerce administers the countervailing duty laws. Id. § 1677(1). Two showings must be made before a CVD can be imposed: (i) that a government subsidy was received, and, (ii) that the subsidy resulted in, or threatens, material injury to American industry. Id. § 1671(a). These two determinations are made by separate bodies. The International Trade Commission determines whether material injury to American industry has occurred, while Commerce determines whether a subsidy was received.[3] Subsidies from certain nations may trigger a CVD even in the absence of a material injury determination. Id. § 1671(c) ("In the case of any article of merchandise imported from a country which is not a Subsidies Agreement country, no determination by the Commission under section 1671b(a) . . . or 1671d(b) of this title shall be required.").

A countervailing duty investigation may be initiated at the request of an interested party or on Commerce's own motion. Id. § 1671a. In the course of such an investigation, Commerce under 19 U.S.C. § 1671b(b) makes a preliminary determination concerning whether a foreign government provided a countervailable subsidy, and the International Trade Commission under 19 U.S.C. § 1671b(a) makes a preliminary determination concerning whether the foreign subsidy resulted in, or threatens, material injury to American industry. If the preliminary investigation discloses that a foreign subsidy was provided, Commerce must suspend liquidation of duties, id. § 1671b(d)(2), and must require the importer to furnish cash deposits as security for

---

[3] This division of authority between Commerce and the International Trade Commission is reflected in various statutory provisions. See 19 U.S.C. §§ 1671(a), 1671b(a)-(b), 1671d(a)-(b).

duties that may be due pending a final determination of the amount of a CVD. Id. § 1671b(d)(1)(B). Once Commerce makes a final determination that a countervailing subsidy was provided by a foreign government, id. § 1671d(a), and once the International Trade Commission has reached a final determination that U.S. industry was materially injured as a result, id. § 1671d(b), Commerce then issues an order setting the countervailing duty, which is typically expressed ad valorem – that is, as a percentage of the value of the imported goods. Id. §§ 1671d(c)(2), 1671e.

The countervailing duty imposed by Commerce must equal the "net countervailable subsidy," 19 U.S.C. § 1671(a), which is calculated by subtracting certain enumerated fees and setoffs from the amount of the subsidy provided by the foreign government. 19 U.S.C. § 1677(6).[4] Countervailable subsidies may be divided further into "recurring" and "non-recurring" benefits. When an importer receives a non-recurring benefit, as occurred here, the benefit must be amortized over the "average useful life" of the subsidy. 19 C.F.R. § 351.524(b)(1)-(d).

Although countervailing duties must be "equal to" countervailing subsidies, the two concepts are not functionally interchangeable.[5] The procedures for determining the

---

[4]     A lengthy technical definition of a countervailable subsidy is contained in 19 U.S.C. § 1677(5). The essential characteristic of a countervailable subsidy is that a foreign government or public entity seeks to encourage exports by conferring a "benefit" on the company receiving it. Such "benefits" include, among others, direct contributions, price supports, favorable loans or loan guarantees, and foreign government equity investments on terms that the country's private markets would not make.

[5]     In this regard, appellants spill considerable ink urging that the setoff cannot be granted because to do so would impermissibly add to the exclusive statutory list of subtractions, 19 U.S.C. § 1677(6), applied to the gross countervailable subsidy to arrive at the net countervailable subsidy. This argument misses the mark. NHC is not challenging Commerce's determination of the amount of subsidy NHC received; rather, it is only seeking to ensure that the duty it ultimately pays is equal to the subsidy it received. See infra section IV.

amount of a countervailable subsidy are different from those for collecting the countervailing duty; indeed, as noted, the two tasks are undertaken by two different entities, Commerce and Customs. More importantly for our purposes, the procedures for contesting an erroneous subsidy calculation are different from those for contesting an erroneous duty assessment. Compare 19 U.S.C. § 1675 (Commerce administrative review of subsidy determination) with id. § 1514(a)(5) (Customs protest for liquidation error). The procedure for contesting a Customs assessment or liquidation essentially involves lodging a timely protest with Customs, the disposition of which is reviewable in the Court of International Trade, see infra Section I.B. By contrast, the procedure for contesting an erroneous subsidy or CVD determination by Commerce requires an objecting party to raise the objection during an administrative review of the CVD order. More specifically, Commerce must, upon request, undertake an annual administrative review of any issued CVD order. 19 U.S.C. § 1675(a)(1). During the administrative proceeding, Commerce must "review and determine the amount of any net countervailable subsidy," which is the basis for a CVD determination, id. § 1675(a)(1)(A), and it is during this review that parties may raise objections, present evidence, and submit written arguments relating to the countervailable subsidy determination, including submission of written arguments. See 19 C.F.R. §§ 351.221, 351.301, 351.309. In this respect, during its annual review, Commerce typically restricts its consideration to entries made during the one year period of review (or "POR"). 19 C.F.R. § 351.213(e)(2)(i). Judicial review of the results of these administrative proceedings is available in the Court of International Trade, 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a(2), with appeal to this Court. 28 U.S.C. § 1295(a)(5).

## B. Liquidation

While a CVD's <u>ad valorem</u> rate is determined administratively by Commerce, the duty itself is collected by Customs.[6] Commerce dictates to Customs the proper countervailing duty rate, 19 U.S.C. § 1671e(a), and Customs "liquidates" the duty, that is, it makes the "final computation or ascertainment of duties . . . accruing upon entry" of the goods. 19 U.S.C. § 1500(d); 19 C.F.R. § 159.1. In other words, Commerce sets the CVD rate and Customs "liquidates" and collects the duty by applying the <u>ad valorem</u> rate to the value of the entered goods. In those instances where a preliminary determination of material injury and countervailable subsidy is made, liquidation is suspended pending completion of the investigation. 19 U.S.C. § 1671b(d)(2). In these instances, Customs will not know the exact amount of the CVD to collect when the goods are actually imported; the CVD is necessarily determined retrospectively, some time after the goods enter the United States. <u>See</u> 19 C.F.R. § 351.213(a). Accordingly, to secure payment of a CVD, an importer of goods subject to countervailing duties must make cash deposits of the estimated duties at the time of entry. 19 U.S.C. §§ 1671b(d)(1)(B), 1671d(c)(1)(B)(ii), 1671e(a)(3). To be sure, the cash deposit rate and the actual countervailing duty rate, as ultimately determined by Commerce, may vary substantially.

As noted, liquidation of a duty is suspended while a countervailing duty investigation is underway. <u>Id.</u> § 1671b(d)(2). At the conclusion of the investigation,

---

[6] At the time of the events giving rise to this dispute, Customs was a bureau of the Treasury Department. In 2003 Customs was consolidated with various other agencies as the Bureau of Customs and Border Patrol, under the auspices of the Department of Homeland Security. 6 U.S.C. §§ 203, 211. This change did not affect Customs' role and function with respect to CVDs.

Commerce instructs Customs on the appropriate countervailing duty rate. Once this occurs, the suspension of liquidation is removed and Customs, in general, is required to "liquidate the entry . . . within 6 months of receiving notice of the removal." Id. § 1504(d). Yet, the time frame shortens where, as here, liquidation is ordered pursuant to an administrative review. In such a case, Customs must, "to the greatest extent practicable," liquidate entries within 90 days. Id. § 1675(a)(3)(B). If an entry of goods is not actually liquidated within six months after suspension of liquidation is removed, it is "deemed liquidated" by operation of law. Id. § 1504(d). While actual liquidation occurs at the rate instructed by Commerce, deemed liquidation under § 1504(d) occurs at the (sometimes higher, sometimes lower) cash deposit rate.[7]

In the process of liquidating entries, Customs must give parties proper notice, and this is so whether the liquidation is actual or deemed. In particular, "bulletin notices" of liquidations must be posted in "a conspicuous place in the customshouse at the port of entry . . . or lodged at some other suitable place." 19 C.F.R. § 159.9(b); see generally 25 C.J.S. Customs Duties § 100. Posting of the bulletin notice triggers the limitations period for protesting a liquidation. 19 U.S.C. § 1514(c)(3)(A); 19 C.F.R. §§ 159.9(c), 174.12(e)(1); see also Goldhofer Fahrzeugwerk GmbH & Co. v. United States, 885 F.2d 858, 860-861 (Fed. Cir. 1989) (failure to provide adequate courtesy notice does not toll limitations period when bulletin notice is adequate). Bulletin notices of actual liquidations are dated when posted, 19 C.F.R. § 159.9(c)(1), while bulletin

---

[7] Deemed liquidation was intended to aid importers by giving them "finality as to their duty obligations by providing for deemed liquidation at the rate claimed by the importers [i.e. the cash deposit rate] unless actual liquidation occurred within specified time limits." Cemex v. United States, 384 F.3d 1314, 1318 (Fed. Cir. 2004) (internal citations omitted). As this case illustrates, however, trading accuracy for finality may be sweet in one case and bitter in another.

06-1044, -1052                    7

notices of deemed liquidations are dated as of the end of the six month statutory period, 19 C.F.R. § 159.9(c)(2)(i), and must be posted only "within a reasonable period after each liquidation by operation of law." Id. § 159.9(c)(2)(ii). In addition to bulletin notices, courtesy notices of actual liquidations and deemed liquidations are typically mailed to the importer. Id. § 159.9(d); see generally 25 C.J.S. Customs Duties § 101.

A liquidation decision itself is "final and conclusive" as to all parties, including the United States, unless protested with Customs, and this is so even if the liquidation contains a "clerical error, mistake of fact, or other inadvertence" adverse to the importer. 19 U.S.C. § 1514(a). Currently, a protest must be filed with Customs within 180 days of liquidation, 19 U.S.C. § 1514(c)(3)(A), although at the time of the liquidation in this case, the protest limitations period was 90 days. See 19 U.S.C. § 1514(c)(3) (1996). If Customs denies a protest, an action challenging the denial may be brought in the Court of International Trade, 28 U.S.C. § 1581(a); 19 U.S.C. § 1515, with appeal to this Court. 28 U.S.C. § 1295(a)(5).

In addition to a protest, other remedies for liquidation errors exist. Customs may sua sponte reliquidate an entry, including an entry "deemed liquidated," within 90 days of its giving notice of the original liquidation to the importer. 19 U.S.C. § 1501. At the time this action accrued, a party also could request Customs to reliquidate an entry under 19 U.S.C. § 1520 to correct certain errors, provided it did so "within one year after the date of liquidation." Id. § 1520 (c) (2000).[8] When an importer could request

---

[8] Until 2004, 19 U.S.C. § 1520(c) allowed for voluntary reliquidation by Customs, providing that

> notwithstanding a valid protest was not filed, the Customs Service may . . . reliquidate an entry to correct . . . a clerical error, mistake of fact, or other inadvertence, not amounting to an error in the construction of law, adverse

06-1044, -1052                    8

discretionary reliquidation under § 1520(c), a port director's failure to reliquidate was also a proper subject for a Customs protest. 19 C.F.R. § 174.11(g).

## II. Facts and Proceedings Below

The material facts are undisputed. Commerce, at the behest of appellant U.S. Magnesium, a domestic producer of magnesium products, investigated certain benefits received by NHC, an importer of magnesium and magnesium alloy.[9] The investigation revealed that NHC received countervailable subsidies in the form of grants from the governments of Canada and Quebec. Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium From Canada, 57 Fed. Reg. 30,946 (July 13, 1992). Commerce amortized these nonrecurring subsidies over fourteen years, the average useful life of assets in the magnesium industry, and ordered an equal amount to be countervailed each year. Id. As a result, magnesium imports from Canada are subject to countervailing duty orders, which have been reviewed annually since 1992. Countervailing Duty Orders: Pure Magnesium and Alloy Magnesium From Canada, 57 Fed. Reg. 39,392 (Aug. 31, 1992).

---

to the importer . . . when the error, mistake, or other inadvertence is brought to the attention of the Customs Service within one year after the date of liquidation.

This voluntary reliquidation provision was repealed in 2004. Pub. L. 108-429, Title II, § 2105, Dec. 3, 2004, 118 Stat. 3598. The § 1520(c) one year limitations period formerly applicable to discretionary reliquidation by Customs must be distinguished from the 90 day limitations period in § 1514(c)(3) applicable to the importer's right to file a protest with Customs.

[9] Commerce is obligated by statute to initiate a countervailing duty investigation upon the filing of a proper petition by any domestic industry entity. 19 U.S.C. § 1671b(b). At the time of this request, U.S. Magnesium was operating under the name Magnesium Corporation of America.

In 1999, Commerce conducted an administrative review of NHC's 1997 magnesium entries. As a result of this review, Commerce set a countervailing subsidy rate of 2.02%. Pure Magnesium and Alloy Magnesium from Canada: Final Results of Countervailing Duty Administrative Review, 64 Fed. Reg. 48,805, 48,806 (Sept. 8, 1999). Accordingly, on December 8, 1999, Commerce lifted the suspension of liquidation then in effect for Canadian magnesium imports and instructed Customs to liquidate the 1997 entries and collect countervailing duties at 2.02%. Customs did not immediately liquidate some of the 1997 entries, with the result that those entries were deemed liquidated by operation of law on March 8, 2000, six months after the 1999 Final Results were published in the Federal Register. See 19 U.S.C. § 1504(d) (any entry not liquidated within 6 months after suspension of liquidation is lifted will be deemed liquidated at cash deposit rate); Int'l Trading Co. v. United States, 412 F.3d 1303, 1308-09 (Fed. Cir. 2005) (publication of final results in Federal Register lifts suspension of liquidation and begins six month period). In September 2000 and February 2001, the port of Port Huron, Michigan gave notice to NHC that its 1997 entries had been deemed liquidated at the cash deposit rate, which for those entries ranged from 3.18% to 7.61%.[10] NHC received actual notice of the deemed liquidations and courtesy notices from Customs. Yet, NHC (i) never filed a protest with Customs under 19 U.S.C. § 1514(c), (ii) never sought reliquidation under 19 U.S.C. § 1520(c), and (iii) did not commence an action against Customs under 28 U.S.C. § 1581(a).[11]

---

[10]     Some of the duties collected were distributed to NHC's domestic competitors under 19 U.S.C. § 1675c.

[11]     NHC contends it would have had no Customs remedy at that point, an issue we address later. See infra Section IV.B.

Instead, NHC waited until the administrative review of its 2001 entries to allege that Customs had over-collected the duties on its 1997 entries, and accordingly requested Commerce to setoff the subsidy rate for the 2001 entries by the amount of the overpayment on the 1997 entries.[12]  Commerce concluded it lacked the authority to make the requested setoff, stating that it

> does not have authority to address what is essentially a customs protest issue concerning entries from a prior, completed review in the context of this administrative review.  Parties cannot revive an issue for which the deadlines for proper challenge have already passed by raising it in an on-going administrative proceeding.

Pure Magnesium and Alloy Magnesium from Canada: Preliminary Results of Countervailing Duty Administrative Reviews, 68 Fed. Reg. 25,339 (May 12, 2003).  In its final results that year, Commerce reiterated that it had properly instructed Customs about the assessment rate for 1997 entries at the time of the 1999 review and that it lacked statutory authority to correct Customs' error.  Pure Magnesium and Alloy Magnesium from Canada: Final Results of Countervailing Duty Administrative Reviews, 68 Fed. Reg. 53,962 (September 15, 2003) (hereinafter the "Final Results").

NHC then filed suit in the Court of International Trade, alleging jurisdiction under 28 U.S.C. § 1581(c).  The United States (on behalf of Commerce) and U.S. Magnesium[13] moved to dismiss for lack of jurisdiction, which motion failed, the Court of International  Trade concluding it had jurisdiction.  Norsk Hydro Canada v. United

---

[12]    By this time, of course, a protest of the deemed liquidation to Customs would have been untimely.  See 19 U.S.C. § 1514(c)(3)(A) (1996) (90 day Customs protest period).

[13]    The United States and U.S. Magnesium are jointly referred to throughout as "appellants."

<u>States</u>, 350 F. Supp. 2d 1172, 1176-83 (Ct. Int'l Trade 2004) ("<u>NHC I</u>"). Although the Court of International Trade concluded NHC may once have had a remedy at Customs, it determined that exhaustion of such a remedy was unnecessary before seeking redress from Commerce. <u>Id.</u> On the merits, the Court of International Trade concluded that Commerce not only had authority to make the setoffs, but was required to do so to satisfy 19 U.S.C. § 1671(a). <u>Id.</u>; <u>Norsk Hydro Canada v. United States</u>, 374 F. Supp. 2d 1275, 1276 (Ct. Int'l Trade 2005) ("<u>NHC II</u>"). On remand, Commerce made the setoffs under protest,[14] and the Court of International Trade entered final judgment in favor of NHC on the administrative record. <u>Norsk Hydro Canada v. United States</u>, 391 F. Supp. 2d 1326 (Ct. Int'l Trade 2005) ("<u>NHC III</u>"). This appeal followed.

### III. Jurisdiction

The threshold question is whether the Court of International Trade correctly concluded it had jurisdiction to hear NHC's claim. Our review of this ruling is <u>de novo</u>, as a trial court's determination of subject matter jurisdiction is a legal conclusion. <u>Consol. Bearings v. U.S.</u>, 348 F.3d 997 (Fed. Cir. 2003).

NHC's claim in the Court of International Trade was brought under 28 U.S.C. § 1581(c), which confers jurisdiction on that court to hear "any civil action commenced under section 516A of the Tariff Act of 1930." Section 516A,[15] in turn, provides for review in the Court of International Trade of certain "reviewable determinations" in countervailing duty proceedings for the purpose of "contesting any factual findings or legal conclusions upon which the [CVD] determination is based." 19 U.S.C. § 1516a(a)(2)(A)-(B). Among the list of reviewable determinations is "a final

---

[14]    See <u>supra</u> note 1.

[15]    Codified at 19 U.S.C. § 1516a.

determination . . . under section 1675 of this title." Id. § 1516a(a)(2)(B)(iii). Section 1675 provides for administrative review of countervailing duty orders. Commerce's decision in Final Results that it did not have the authority to order the requested setoff is just such a § 1675 "final determination." Given this, it follows that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(c) to hear NHC's claim that Commerce erred in deciding that it had neither the obligation nor the authority to make the requested setoff.

Appellants seek to avoid this result by arguing that the Court of International Trade never had jurisdiction because this action, however pled by NHC, is a challenge to Customs' erroneous liquidation of the entries, not to Commerce's § 1675 administrative review of the CVD. They assert NHC has attempted by "artful pleading" to convert an unreviewable Customs decision into a reviewable Commerce determination by raising the Customs decision in Commerce's administrative proceeding.

This argument, closely scrutinized, fails. It is true that the Court of International Trade, like all federal courts, is a court of limited jurisdiction, and that the party invoking that jurisdiction bears the burden of establishing it. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). It is also true that a party may not expand a court's jurisdiction by creative pleading. As we have noted, "mere recitation of a basis for jurisdiction, by either a party or a court, cannot be controlling . . . we look to the true nature of the action in the district court in determining jurisdiction of the appeal." Williams v. Sec'y of Navy, 787 F.2d 552, 557 (Fed. Cir. 1986) (internal citations omitted). Importantly, however, the "true nature" of NHC's action in the Court of

International Trade is an appeal of Commerce's legal determination that it lacked authority to setoff the erroneous liquidations. Given that this is the "true nature" of the action, it follows that the matter falls squarely within § 1581(c), and hence the Court of International Trade correctly concluded that it had jurisdiction.

It is also worth noting that appellants mislabel their jurisdictional argument as "artful pleading" or as the failure to exhaust remedies. Neither label fits. NHC has not engaged in "artful pleading" in the true sense of the term, as there is no contention that NHC premised jurisdiction on an impermissibly anticipated defense or counterclaim, or intentionally failed to plead a necessary federal issue in order to avoid federal jurisdiction. Compare Skelly Oil v. Phillips Petroleum, 339 U.S. 667, 671-74 (1950); see generally Miller, Artful Pleading: A Doctrine in Search of Definition, 76 Tex. L. Rev 1781 (1998). To argue, as appellants do, that jurisdiction here is the product of artful pleading amounts to no more than argument by epithet.

Nor does appellant's argument fare any better when framed as a failure to exhaust remedies. In fact, appellants argue not failure to exhaust, but rather that NHC's sole and exclusive remedy was a timely protest to Customs followed, if necessary, by Court of International Trade review pursuant to § 1581(a). While it is true that NHC could have remedied the deemed liquidations to Customs had it acted in a timely fashion[16] and that the results of such a protest would have been judicially reviewable pursuant to § 1581(a), this case is not a request to review any such protest, but rather a request to review Commerce's legal determination that it has no authority to make the requested setoff. To put this point differently, the Court of International Trade correctly determined its jurisdiction because the availability of remedies under § 1581(a) at some

---

[16]    See supra Section I.B and infra Section IV.B.

point in the past does not preclude, and indeed has no bearing on, the availability of remedies under § 1581(c) today. As the Court of International Trade correctly pointed out, § 1581(a) and (c) make no reference to each other; each is a "separate and distinct avenue for relief." NHC I, 350 F. Supp. 2d at 1179-80. While this fact has substantive implications for the redressability of a Customs error by Commerce, it militates against reading the statutes to mean that just because relief was once available under § 1581(a), it cannot now be available in a Commere administrative proceeding, the results of which would be judicially reviewable under § 1581(c).[17]

The propriety of jurisdiction in this case is vividly illustrated if one assumes, contrary to what occurred here, that Commerce had decided it did have authority to make the setoff. In that circumstance, we doubt that U.S. Magnesium would be arguing that the Court of International Trade lacked jurisdiction over an appeal from such a determination made in the course of the Commerce proceeding. To the contrary, it is clear that U.S. Magnesium would be attempting to invoke the Court of International Trade's jurisdiction to dispute Commerce's substantive authority. It is pellucidly clear from this that § 1581(c) properly provided the Court of International Trade jurisdiction to review Commerce's legal determination concerning the setoff whatever that determination might be.

---

[17] Nor did the Court of International Trade abuse its discretion in refusing to impose an "exhaustion" requirement under 28 U.S.C. § 2637(d). We have our doubts about the Court of International Trade's argument based on legislative acquiescence to the Serampore decision, 350 F. Supp. 2d at 1180-82, as it is highly questionable whether legislative inaction in response to any particular judicial decision construing a statute should be presumed to reflect affirmative approval rather than unawareness or sheer inertia. The absence of prejudice to Commerce from NHC's delay, however, is sufficient to sustain the Court of International Trade 's exercise of its discretion in this regard.

06-1044, -1052                 15

Appellants' cited cases do not persuade us to the contrary. This is not a case like the ubiquitously-cited American Air Parcel Forwarding v. United States, 718 F.2d 1546 (Fed. Cir. 1983), where a litigant seeks to invoke the Court of International Trade's § 1581(i) residual jurisdiction because the litigant cannot pass muster under any of the more specific grants of jurisdiction in § 1581(a)-(h). Rather, here NHC seeks to substitute one specific grant of jurisdiction, namely § 1581(c), for another specific jurisdictional grant no longer available, namely § 1581(a). As long as plaintiff alleges an injury actionable under subsection (c), there is no reason to disallow it simply because, at one time, that injury would have been redressable under subsection (a).[18] Nor is the Juice Farms v. United States, 18 Ct. Int'l. Trade 1037 (1994), case cited by appellants on point. Although it is true that Juice Farms held that challenges to liquidations cannot be brought under § 1581(c), it did so in the context of a direct appeal of a Customs liquidation protest, not an appeal of a Commerce determination in a countervailing duty proceeding. Finally, the case of Nichimen v. United States, 938 F.2d 1286 (Fed. Cir. 1991), is also of no avail to appellants. They cite it for the proposition that the Court of International Trade lacks jurisdiction over a Customs protest when the substance of that protest is a challenge to a Commerce decision, and ask that we now apply the converse rule, namely that the Court of International Trade lacks jurisdiction over a contested

---

[18] On the other hand, to say, as NHC and the trial court do, that Congress intended an "election of remedies" between subsections (a) and (c) of § 1581 goes too far, as the two subsections were intended as remedies for distinct injuries: Customs errors in (a), and Commerce errors in (c). The more reasonable inference is that Congress had no intent in this regard because it did not foresee that a party would ask Commerce, in an administrative proceeding reviewing a CVD order, to correct a Customs error relating to the order. The fact that Congress may not have anticipated the specific procedural posture of this case, however, does not authorize this Court or the Court of International Trade to erect jurisdictional hurdles for plaintiffs who otherwise meet the requisites for a § 1581(c) action.

Commerce duty proceeding when the substance of the protest challenges a Customs error. This argument fails because the Court of International Trade's lack of jurisdiction over some claims in Nichimen resulted from the fact that the decisions in that case were not amenable to Customs protest at all under the applicable protest statute. See id. at 1290-92. By contrast, the administrative review statute here in issue, § 1675(a)(1)(A), clearly grants Commerce legal authority to "determine the amount of any net countervailable subsidy" during annual reviews, and Commerce reached the legal conclusion that it had no authority to adjust the amount of countervailable subsidy by the CVD overpayments. As noted, Commerce's legal decisions in the administrative process are subject to judicial review under 19 U.S.C. § 1516a(a)(2)(A) and 28 U.S.C. § 1581(c). Nichimen cannot be read for some broader principle of law barring otherwise-proper Court of International Trade jurisdiction when CVD determinations might have been challenged at an earlier point. In short, the case law does not support the notion that jurisdiction under § 1581(c) is disallowed simply because jurisdiction formerly available under § 1581(a) no longer exists.

Once the issue presented to the Court of International Trade and reviewed here is properly framed not as a challenge to the erroneous liquidation, but rather as a challenge to Commerce's determination that it lacked the authority to make the setoff, it is apparent that the Court of International Trade correctly determined its jurisdiction. This is so because Commerce's decision that it lacked authority to remedy the deemed liquidation was a "legal conclusion upon which its determination is based."[19] 19 U.S.C.

---

[19] Just because Commerce concluded that it lacked authority to make the requested setoff hardly means it is not drawing a "legal conclusion." A legal position by an agency that it lacks authority is no less a legal conclusion for interpreting agency authority narrowly.

§ 1516a(a)(2)(A). As such, it is reviewable under § 1581(c), even though NHC would have been time-barred had it attempted to protest the deemed liquidation to Customs.

### IV. The Merits

We next review the Court of International Trade's decision that Commerce had both the power and the obligation to make the requested setoffs. And we use the same standard of review the Court of International Trade used in reviewing the Commerce administrative record: Commerce's determinations of fact must be sustained unless unsupported by substantial evidence in the record and its legal conclusions must be sustained unless not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). We review the Court of International Trade's legal conclusions de novo. PPG Indus. v. United States, 978 F.2d 1232, 1236 (Fed. Cir. 1992).

We begin, as we must, with the language of the applicable statutes. The parties correctly argue that Commerce's authority to make the requested setoffs, if it exists, must be found in 19 U.S.C. §§ 1671(a) and 1675. The Court of International Trade based its conclusion that Commerce not only had the authority but also an obligation to make the setoffs on an interpretation of those two provisions, and they are the provisions chiefly urged by NHC. Section 1671(a) imposes countervailing duties as a general matter. It provides that where a foreign government is providing countervailable subsidies on imported goods and an American industry is injured or threatened as a result, "there shall be imposed upon such merchandise a countervailing duty . . . equal to the amount of the net countervailing subsidy." 19 U.S.C. § 1671(a) (emphasis added). And § 1675(a)(1)(A) provides that "at least once during the 12 month period beginning on the anniversary date of the publication of a countervailing duty order . . .

the administering authority shall . . . review and determine the amount of any net countervailable subsidy." Because § 1671 requires the "duty imposed" to be "equal to the amount of the net countervailing subsidy," NHC contends that Commerce must take into account the past erroneous liquidations when, in the course of a § 1675 review proceeding, it undertakes to determine duties for a later year. Otherwise, NHC argues, the overall duty imposed will be greater than the amount of the overall subsidy benefit received, a result forbidden by the statute.

The success of NHC's argument turns on two controverted interpretations of § 1671. Specifically, NHC argues, and the Court of International Trade agreed, that duties are "imposed" when the relevant entry is liquidated or collected. NHC I, 350 F. Supp. 2d at 1180-82. If duties are "imposed" when liquidated or collected, then the duties liquidated and collected must equal the subsidy received to avoid an imposition error. In contrast, if, as appellants argue, duties are "imposed" earlier in the CVD process, when the subsidy and material injury determinations are made, an error later in the CVD process (such as during liquidation), while still an error, does not cause an imposition error as to that POR.

NHC also argues, as it must to prevail, that § 1671's requirement that the CVDs must equal the countervailing subsidy applies to the entire useful life of a nonrecurring subsidy, rather than to each POR therein. The Court of International Trade agreed with this proposition as well. NHC I, 350 F. Supp. 2d at 1184. The significance of this issue is that, even if we grant that duties are "imposed" when liquidated, the appellants would still prevail if PORs are sufficiently inviolable that Commerce is not obligated to correct mistakes from one POR in another. Of course, appellants argue that PORs are distinct

and that mistakes in one are not correctable in another, or at least that Commerce acted reasonably in so holding.

If we accept both propositions – that duties are imposed when liquidated and that the integrity of the POR may be violated to ensure that duties imposed equal subsidies received – then Commerce arguably violates § 1671 by refusing to take past erroneous liquidations into account when calculating countervailable subsidies in subsequent PORs. This is so because the duty "imposed" over the life of the subsidy would be greater than the value of the subsidy itself. In contrast, if appellants' arguments are accepted, the statute's mandate that duties "imposed" equal the net countervailable subsidy would not be violated by Commerce's refusal to alter the CVD rate to account for liquidation errors from a prior POR, since those errors do not affect imposition in the current POR. We address each link in the chain of NHC's argument in turn: first, when duties are "imposed," and second, whether countervailing duties must equal countervailable subsidies over multiple PORs or merely during each POR considered separately. On both points, we find appellants' arguments persuasive.

### A. The Meaning of "Impose"

First, NHC raises the possibility that the appellants may have procedurally forfeited the issue of the meaning of "impose" by not raising the issue below, see NHCI I, 350 F. Supp. 2d at 1181 n.8, or in its initial brief before this Court. We disagree. In Consolidation Coal v. United States, 351 F.3d 1374, 1378 (Fed Cir. 2003), we stated that preserving an issue for appeal does not require "the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue." (internal citations omitted). The Court of International Trade knew it had to

construe the term "imposed," see NHC I, 350 F. Supp. 2d at 1180-82, and it is obvious here, as well. We conclude it is proper to resolve this issue on appeal.

We turn now to the merits of the issue. NHC argues that duties are "imposed" when "assessed" and that they are "assessed" when liquidated. In support, they contend Commerce itself has interpreted "imposed" to mean "assessed and paid," and that it would be unreasonable for Commerce to use a different definition here. It is true that Commerce has occasionally interpreted "imposed" to mean "assessed," but it is also true that it has done so only in a different statutory context, namely the anti-dumping laws. See Serampore Indus. v. United States, 675 F. Supp. 1354, 1358-60 (Ct. Int'l Trade 1987) (construing then 19 U.S.C. § 1677a(d)(1)(D) (1982); now codified at § 1677a(c)(1)(C)). Regardless of how Commerce has interpreted "impose" in the anti-dumping context, in the CVD context it is obvious that the imposition and assessment or liquidation of duties are distinct events and it does not make sense, therefore, to equate them. In particular, § 1671(a) establishes the substantive criteria for whether CVDs should be "imposed." And because it is Commerce that decides whether those criteria are satisfied, it follows that CVDs are "imposed" before liquidation, since Commerce is not involved in liquidation. Specifically, § 1671(a) and § 1671d are clear that CVDs are "imposed" once determinations about (i) material injury and (ii) countervailable subsidy are made. Those determinations are made by the International Trade Commission and Commerce, respectively. Neither of those bodies engage in the assessment or liquidation of duties, which is instead carried out by Customs after receiving instructions from Commerce.[20] It is clear, therefore, that in the

---

[20] Numerous authorities make this clear. For example, the countervailing duty law at 19 U.S.C. § 1671e(a)(1) provides that "[Commerce] shall publish a countervailing

CVD context, imposition of CVDs and assessment or liquidation of those duties are distinct events that should not be equated or conflated.

Given that the CVD laws clearly state that such duties are "imposed" by Commerce but "assessed" when liquidated by Customs, we reject NHC's invitation to construe "impose" in § 1671 to mean "liquidate."[21] Instead, we read the CVD statutes as the appellants propose: Commerce imposes CVDs, then Customs assesses and liquidates them. As a consequence, Commerce's failure to make the setoffs does not result in the imposition (in the relevant sense) of a duty greater than the benefit received. Commerce "imposed" the duties in the prior POR by entering an order correctly instructing Customs about the amount of duties to be collected,[22] and once it

duty order . . . which directs customs officers to assess a countervailing duty equal to the amount of the net countervailable subsidy." This proposition also finds support in a recent rulemaking establishing procedures for the transfer of antidumping and countervailing duties to domestic producers. See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 33,920, 33,922 (June 26, 2001) (proposed rule) ("[A]ntidumping or countervailing duties accruing on imported merchandise are not assessed until each entry . . . is liquidated.").

[21] NHC also argues that, to the degree "imposed" is ambiguous, the Charming Betsy canon requires that we construe the term "impose" in § 1671(a) consistent with Article 19:4 of the WTO Subsidies and Countervailing Measures Agreement, to mean "the final assessment of duties," in other words, liquidation. The rule of interpretation announced in Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804), instructs that domestic law should be interpreted consistently with American international obligations to the degree possible. Even if our interpretation of § 1671(a) is inconsistent with Article 19:4, which is doubtful, NHC's argument fails for several reasons. First, it was not presented to the Court of International Trade. See NHC I, 350 F. Supp. 2d 1172. Second, Article 19.4 is not self-executing and therefore "cannot become binding domestically unless Congress implemented it through domestic legislation." Defenders of Wildlife v. Hogart, 330 F.3d 1358, 1362 (Fed. Cir. 2003). Indeed, Congress has precluded challenges to agency action on the grounds that they are inconsistent with Uruguay Round Agreements, of which Article 19:4 is a part. 19 U.S.C. § 3512(c)(1)(B).

[22] Moreover, because we believe the statutes are quite clear that "imposition" and "assessment" are distinct steps in the CVD process, we need not reach the question of deference under step two of the Chevron analysis. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 842-843 (1984). Were we to do so, however, we would find

06-1044, -1052                                  22

did so it was entitled to assume that liquidation would occur consistent with its instructions for that POR. Because Commerce is entitled to so assume, it is not obligated to correct an assessment or liquidation error from a past POR when reviewing the correctness of the duties imposed in the instant POR.

In short, an assessment error as to one entry does not cause an imposition error as to that entry because assessment is a distinct step in the CVD process that occurs after imposition. Put another way, an assessment error as to one entry also does not cause an imposition error as to a future entry or POR – unless Commerce is required by the statute to take account of errors from prior PORs. We take this question up next and resolve it in the negative.

## B. The POR

The second issue we must resolve is whether the Court of International Trade erred in holding that Commerce is legally required to take account of entries outside the POR in order to implement the statutory mandate that countervailing duties must equal countervailable subsidies. If Commerce's review pursuant to § 1675(a) is limited solely to the 2001 entries, then it follows that Commerce correctly concluded that there could be no setoff.

Analysis of this question properly begins with the text of the statute governing administrative review of Commerce's countervailing duty decisions. Section 1675(a)(1)(A) provides that

> at least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order . . . the administering authority, if a request for such a review has been received and after

Commerce's interpretation reasonable for the same reasons elaborated herein. See supra Section IV.A.

publication of notice of such review in the Federal Register, shall review and determine the amount of any net countervailable subsidy.

While the text of § 1675 is silent on the length of the POR, Commerce has interpreted this statute to mean that only entries received during the one-year period under review may be considered. Specifically, the pertinent regulation provides that, "except as provided . . . an administrative review under this section normally will cover entries . . . during the most recently completed calendar year." 19 C.F.R. § 351.213(e)(2)(i).[23] This interpretation of § 1675 by Commerce is entitled to deference here unless Congress has expressed a contrary view or the interpretation is unreasonable. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984). The statute's silence on this matter confirms that Congress has not expressed a contrary view. Thus, we move on to the reasonableness of Commerce's construction.

We are persuaded that Commerce's interpretation is reasonable, indeed invited by the statute. This is so because the statute contemplates annual reviews, and hence limiting § 1675 review to entries made during the POR in issue reasonably serves important goals of finality and efficiency. Given that Commerce undertakes annual reviews, it would be duplicative and wasteful for later reviews to revisit matters subject to review in prior PORs. Revisiting issues that were resolved in prior review proceedings would impair the finality of any one annual review, potentially prolonging a CVD dispute far beyond the year to which it relates. The same potential exists with

_____

[23] The qualifier "normally" in the regulation does not contemplate wholesale abandonment of the POR concept in some cases, but rather a pragmatic modification of some aspect of normal review procedures, such as the use of a fiscal year rather than a calendar year as the relevant period, or similar technical changes. Cf. Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 55,578 at cmt. 9 (October 16, 1998) (construing the analogous regulation governing anti-dumping PORs as providing flexibility to use sale date rather than entry date to determine which goods belong in which PORs).

respect to issues relating to entries from a prior year that were not raised for Commerce review during the appropriate POR. With respect to these issues there is also the risk that, owing to the passage of time, relevant evidence might be lost. The reasonableness of Commerce's interpretation finds further support in the reported decisions, which while not directly on point, are nonetheless persuasive. These decisions upheld as reasonable Commerce's decision to confine its review to entries made during the POR by permitting discretionary recission of administrative reviews where no entries were made during the POR. See e.g., Allegheny Ludlum v. United States, 346 F.3d 1368, 1371 (Fed. Cir. 2003); Chia Far Indus. Factory Co. v. United States, 343 F. Supp. 2d 1344, 1373-74 (Ct. Int'l Trade 2004). For these reasons, we believe Commerce's construction of § 1675 is reasonable.

NHC's arguments to the contrary do not persuade us. NHC first argues that if Commerce is allowed to construe § 1675(a)(1)(A) to preclude it from correcting a prior POR Customs liquidation error, Commerce will not calculate correctly the net countervailing subsidy, and thus violate the law by instructing Customs to collect a CVD that does not equal the net countervailable subsidy.[24] See 19 U.S.C. § 1671. It is true that if § 1675 is construed to limit Commerce's consideration to entries made within the POR, Commerce will not be able to correct a liquidation error by Customs. But this possibility occurs only if the Customs error is never remedied by way of a timely protest to Customs or by Customs sua sponte, as contemplated by the statutes. See 19 U.S.C. §§ 1514, 1501. In other words, this possibility is accommodated by the statutes in the provision of Customs remedies. Customs carries out the liquidations, and the statutes

---

[24]     This was the position of the Court of International Trade. See NHC I, 350 F. Supp. 2d at 1182-83.

give it the power to correct its own errors.  Once a liquidation error is remedied by Customs, the CVD collected will equal the subsidy, as required by the statute.

The fact that the liquidation in this case was deemed, rather than actual, does not change this analysis or the conclusion reached here.  We have quoted the Court of International Trade with approval to the effect that a deemed liquidation adverse to an importer is protestable.  See Cemex v. United States, 384 F.3d at 1318 (Fed. Cir. 2004) ("If a deemed liquidation or any liquidation is adverse to an importer, it has its protest remedies under 19 U.S.C. § 1514 and access to judicial review under 28 U.S.C. § 1581(a).") (quoting Cemex v. United States, 279 F. Supp. 2d 1357, 1362 (Ct. Int'l Trade 2003)).[25]  Moreover, it is also true that at the pertinent time, a denial of a § 1520(c) request for reliquidation would have been a protestable Customs decision, with further review available in the Court of International Trade and this Court, if necessary.  19 C.F.R. § 174.11(g).  And, although an importer may no longer request discretionary reliquidation to correct an erroneous deemed liquidation, Customs may nonetheless correct an error adverse to an importer by reliquidating sua sponte under 19 U.S.C. § 1501.[26]  In short, at the time of the erroneous deemed liquidations at issue,

---

[25]     NHC, citing U.S. Shoe v. United States, 114 F.3d 1564, 1569 (Fed. Cir. 1997), argues that deemed liquidations are not Customs decisions and hence not protestable.  This is too broad a reading of our decision in U.S. Shoe.  Neither presented nor addressed there was the question whether a deemed liquidation is protestable to Customs where, as here, a Commerce order has issued requiring Customs to liquidate at a specific rate, but Customs nonetheless ignores this order and allows liquidation to occur at an incorrect rate.

[26]     United States v. Cherry Hill Textiles, 112 F.3d 1550, 1560 (Fed. Cir. 1997), which held that Customs could not reliquidate under § 1501 once deemed liquidation occurred, is not to the contrary, as we there construed an older version of § 1501 which provided only for reliquidation of entries originally liquidated under § 1500, unlike the current statute, which permits reliquidation of "a liquidation made in accordance with section 1500 or 1504."  Since § 1504(d) is the deemed liquidation provision, it follows that deemed liquidations are subject to reliquidation by Customs.

Customs remedies were available to NHC.  The availability of such remedies to correct liquidation errors means that Commerce's interpretation of § 1675 is not unreasonable, as it need not cause liquidation errors to distort countervailing duties.

NHC's second argument against the reasonableness of Commerce's construction of § 1675 is that Commerce in its annual reviews in fact considers events outside the POR when it amortizes the countervailing subsidy over a fourteen year period.  This argument also fails.  Amortization of a non-recurring subsidy is not inconsistent with preserving the integrity of separate PORs; it simply reflects that a non-recurring subsidy received in one POR may provide a "benefit" in other PORs.  This is far different from effectively reopening past PORs to allow setoffs in subsequent PORs, as Commerce was asked to do here.

The authorities cited by NHC to prove otherwise are not persuasive.  In particular, the hypothetical posed by the Commerce Department in Certain Pasta from Italy is not analogous.  There, Commerce suggested that if an importer repays part of a prior non-recurring subsidy to the foreign government during a later POR, Commerce would reduce the amount of subsidy to be countervailed.  See Certain Pasta From Italy: Final Results of the Fourth Countervailing Duty Administrative Review 66 Fed. Reg. 40,987 at cmt. 7 (Dec. 12, 2001).  This statement does not help NHC for several reasons.  First, Commerce ultimately concluded that it could set off repaid subsidies only if they were not yet countervailed, that is, if they were received and repaid during the current POR.  Certain Pasta From Italy: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review, 67 Fed. Reg. 16,722, 16,726 (Apr. 8, 2002).  Second, repayment of a nonrecurring subsidy to a foreign government is different from

overpayment of duties intended to countervail a nonrecurring subsidy. Commerce acts reasonably in treating the two cases differently.

In summary, Commerce's refusal to consider the 1997 entries during the 2001 POR reflected a permissible interpretation of § 1675. That other interpretations may also be plausible does not render <u>Chevron</u> deference inappropriate. Therefore we defer to Commerce's interpretation under <u>Chevron</u>.

## V. Conclusion

There remains only the proper disposition of the appeal. For the reasons stated herein, the judgment of the Court of International Trade is REVERSED and the matter is REMANDED so that the setoff issued by Commerce at the Court of International Trade's direction can be vacated.

<u>REVERSED and REMANDED</u>